UNITED STATES of America, Appellee,

v.

Marcus RUBIN, Defendant–Appellant.

No. 1536, Docket 93–1866.

United States Court of Appeals,
Second Circuit.

Argued June 6, 1994.

Decided Sept. 23, 1994.

Marjorie M. Smith, Legal Aid Soc., New York City, for defendant-appellant Rubin.

Douglas M. Lankler, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. S.D.N.Y., Nelson W. Cunningham, Asst. U.S. Atty., of counsel), for appellee.

Before: WINTER and WALKER, Circuit Judges, and POLLACK, District Judge.*

WALKER, Circuit Judge:

Defendant Marcus Rubin appeals from a judgment entered in the United States District Court for the Southern District of New York (Robert L. Carter, *District Judge*) following his conviction by a jury of two counts of bank fraud in violation of 18 U.S.C. § 1344 and his sentence of twenty-one months imprisonment and three years of supervised release. We affirm.

## BACKGROUND

Rubin owned a small jewelry business in New York City facing financial hardship. In the course of his business dealings, he incurred a $15,000 debt to his friend and associate in the jewelry business, Laszlo Schwartz. Hoping to recoup some of this debt, Schwartz referred some potential "good business" to Rubin in February of 1992. What transpired as a result of this referral led to Rubin's criminal prosecution for bank fraud.

In the first few months of 1992, a group of checks disappeared from the United States mail. Ten of these checks were mailed to the Sandy Hook Pilot's Association ("Sandy Hook") by its shipping customers. An eleventh check was intercepted en route to Ciba–Geigy Corporation from Ogden Services. All of these checks eventually wound up in the hands of one Joshua Joffe.

In February of 1992, Joffe contacted Schwartz who, like Rubin, owned a small jewelry firm in New York City. Joffe showed Schwartz a stack of checks a half-inch thick and offered him fifty percent of the proceeds if he would cash any of the checks. Schwartz declined, but after further entreaties by Joffe, Schwartz referred Joffe to his friend Rubin. Schwartz testified that he did so because he knew that Rubin was "desperate for money." Shortly thereafter, Schwartz contacted Rubin and told him to expect a call from Joffe. Schwartz testified that he conveyed to Rubin the illegal nature of Joffe's business.

Telephone records introduced at trial confirmed that Joffe contacted Rubin shortly after meeting with Schwartz, and that the two spoke four times between February 19, 1992 and March 9, 1992. On March 11, Rubin deposited into his business account at Citibank a check payable to a Sandy Hook agent named "T.A. McGoldrick" in the amount of $40,099.26. Before this deposit, Rubin's account had a balance of $46, and the most recent deposit had been three months earlier for $100. Although the Sandy Hook check bore a forged endorsement, the bank cleared it. During the ensuing two weeks, Rubin drained virtually the entire balance from the account.

On March 25, 1992, shortly after depleting the proceeds from the Sandy Hook check, Rubin presented another large check for deposit into his account. This check, payable

---

* The Honorable Milton Pollack, Senior Judge for the United States District Court for the Southern District of New York, sitting by designation.

to Ciba–Geigy in the amount of $45,153.90, also bore a fraudulent endorsement. This time bank officials discovered the fraud and froze Rubin's account.

When questioned by bank officials a week later, Rubin denied knowledge of any scheme to pass stolen or forged checks. Rubin falsely claimed that the payee of the first check, McGoldrick, had tendered both checks as payment for jewelry. In response to inquiries by the officials about McGoldrick's purchase, Rubin said that he had no records documenting the transaction and had no way of contacting McGoldrick to corroborate his story. Later, as Rubin was leaving this meeting, he told the bank officials that he would contact McGoldrick. The officials asked Rubin how such contact could be possible if, as he had just stated, he had no way of reaching McGoldrick. Rubin replied that he did indeed have a beeper number for McGoldrick; however, he refused to give this number to bank officials.

Shortly after this meeting, Rubin contacted the co-signer on his account to explain Citibank's decision to freeze the account. Rubin told the co-signer that he had done some business with an individual who had given him bad checks. Rubin stated that he had only met this person on the street or in a bar and had no way of contacting him.

In the meantime, the FBI had begun to investigate Rubin's deposits. Agents questioned Rubin about the stolen checks and his relationship with McGoldrick. He told the agents that McGoldrick was in fact a social friend with whom he had had drinks on five to ten occasions, and that McGoldrick had used the checks to purchase jewelry. He further stated, contrary to his earlier statement to the bank officials, that he had no number to reach McGoldrick. At this meeting, Rubin also produced a $16,000 invoice from Schwartz's jewelry firm. He said that this invoice was for jewelry that he purchased from Schwartz and subsequently sold to McGoldrick. At trial Schwartz testified that the invoice was phony and that he had prepared it at Rubin's request to help Rubin cover up his misdeeds. McGoldrick testified that he had never seen, much less met, Rubin prior to the day of his trial testimony.

Apart from the two checks cited in the indictment, the government during its case-in-chief introduced the nine other stolen checks addressed to Sandy Hook, which had also been fraudulently cashed or deposited and, following cancellation, had been returned to their issuers. The government introduced expert testimony that phony "McGoldrick" endorsements on five of the Sandy Hook checks—including the one deposited by Rubin—were made by the same person; that the endorsements on four of the remaining Sandy Hook checks were signed by the same person, though perhaps not the same person who signed the McGoldrick checks; and that the printed handwriting on seven of the checks belonged to the same person. Further, the jury heard Rabbi Jacob Friedman testify that he had cashed two of the stolen Sandy Hook checks at Joffe's request. Finally, an expert testified that one of the Sandy Hook checks bore Joffe's fingerprint.

Rubin sought to preclude the introduction of the nine checks, other than the two charged in the indictment, as irrelevant. Judge Carter denied Rubin's request; he held that the non-indictment checks could be introduced to show Rubin's knowledge that the endorsements were fraudulent because Rubin was planning to contest such knowledge.

Rubin did not testify. He presented two character witnesses, a neighbor and a business associate, who stated that they had known Rubin for many years and believed him to be an honest person. Following his conviction on the two counts of bank fraud and his sentence, Rubin appealed.

## DISCUSSION

### I. Introduction of the Non-indictment Checks

Rubin's primary argument on appeal centers around the admission of the nine non-indictment checks. First, he claims that these checks were irrelevant to his criminal culpability which was limited to depositing the two indictment checks and should therefore have been excluded pursuant to Rule 402 of the Federal Rules of Evidence. Even

if deemed relevant under Rule 402, Rubin argues that the district court should have excluded these checks under Rule 403 because the unfair prejudice to Rubin occasioned by their introduction would far outweigh any probative value they might offer. As a corollary, Rubin contends that the district court's limiting instruction concerning the non-indictment checks given at the close of the government's case deprived him of a fair trial. We address each contention in turn.

### A. *Relevance of the Non-indictment Checks*

■ Determinations of relevance are entrusted to the sound discretion of the district court, and we will not override its decision unless arbitrary or irrational. *United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994); *United States v. Simmons,* 923 F.2d 934, 948 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991). The Federal Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Rubin contends that Judge Carter's decision to admit the non-indictment checks was arbitrary and irrational because there was no evidence that Rubin had any connection to these checks, or even knowledge of them. He reasons that these checks could not be probative of whether he received the two indictment checks from Joffe or whether he knew the endorsements were forged. We disagree.

■ To be guilty of bank fraud one must "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice . . . to defraud a financial institution." *United States v. Ragosta,* 970 F.2d 1085, 1088 (2d Cir.) (quoting 18 U.S.C. § 1344), *cert. denied,* —— U.S. ——, 113 S.Ct. 608, 121 L.Ed.2d 543 (1992). We believe the evidence was relevant as tending to establish that Rubin knowingly executed a scheme to defraud the bank. The non-indictment checks, together with testimony pertinent to them, helped demonstrate that Joffe informed several people that he

was trying to launder stolen checks and that Rubin received the two indictment checks from Joffe, not his "friend" McGoldrick. In conjunction with other evidence presented by the government, this evidence tends to prove that Rubin must have known that the checks that he deposited were stolen and fraudulently endorsed and that in cashing them he would defraud the bank.

To establish the first step in this argument, the government portrayed Joffe as someone attempting to launder numerous stolen checks. Rabbi Friedman's testimony that he cashed several checks for Joffe supported this characterization, as did Schwartz's testimony that Joffe approached him seeking someone to cash a half-inch stack of checks. Expert testimony established that the writing on these checks matched that on one of the indictment checks and that Joffe's fingerprint appeared on one of the checks. This testimony along with the admission of the non-indictment Sandy Hook checks supported the testimony of Friedman and Schwartz that Joffe approached them with fraudulently endorsed checks. Such evidence also strengthened the second part of the government's argument, namely, that Rubin received the two indictment checks from Joffe, and not from McGoldrick, as he claimed. Finally, Schwartz's call to Rubin describing the illegal nature of Joffe's business evidenced Rubin's knowledge of Joffe's role in the laundering scheme. Thus, the non-indictment checks were an important part of the government's attempt to show that Rubin's knowledge of fraud was "more probable . . . than it would be without the evidence." Fed.R.Evid. 401.

The non-indictment checks were relevant in establishing Rubin's culpability in additional ways. With Joffe established as the source of the checks, Rubin's statements to bank officials and police that he received the checks from McGoldrick in exchange for jewelry were false exculpatory statements, circumstantial evidence from which Rubin's consciousness of guilt, and ultimately guilt, could be inferred. *See United States v. Quiroz,* 13 F.3d 505, 510 (2d Cir.1993). The non-indictment checks also bolstered the testimony of Schwartz, a critical government witness,

whose credibility, all agree, was open to serious question. It was Schwartz who provided the main link between his friend Rubin, whom he knew to be desperate for money, and Joffe, who had appeared on Schwartz's doorstep with a stack of checks.

Therefore, we do not find that the district court abused its discretion in concluding that the non-indictment checks were relevant.

### B. *Rule 403 Balancing*

Rubin next argues that even if the non-indictment checks were relevant, any marginal probative value was "substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403, since the jury would naturally conclude that his role in the scheme went beyond depositing the two indictment checks. We disagree with Rubin that Judge Carter abused his discretion in concluding that the prejudicial effect of the non-indictment checks did not outweigh more fully their probative value. In reviewing a challenge to a Rule 403 balancing, "we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Arango–Correa*, 851 F.2d 54, 58 (2d Cir.1988) (internal quotations and citation omitted).

As discussed above, the probative value of the non-indictment checks was that they tended to establish Joffe as the source of the stolen checks, thereby negating Rubin's statements that he received the two indictment checks from his "friend" McGoldrick, and at the same time, buttressing the testimony of Friedman, and particularly Schwartz, about Joffe's role. By contrast, any prejudice engendered by the introduction of the non-indictment checks was minimal. The government never argued that Rubin was involved in Joffe's overall stolen check operation and only referred to the non-indictment checks as evidentiary support for the fact that Rubin received the two indictment checks from Joffe. Although the government's handwriting expert testified that Rubin could not be ruled out as the source of the writing on the checks, the government never suggested to the jury that Rubin had a role in Joffe's scheme beyond depositing the two indictment checks. Moreover, if there was any confusion on this score, Judge Carter remedied it in several ways. Immediately after the government's last witness testified, and without any prompting from defense counsel, he reemphasized to the jury that "Mr. Rubin is on trial for bank fraud as regards two checks." Shortly thereafter Judge Carter reiterated that "[h]e is only on trial for the two checks" in the indictment, and that the jury should "consider [the non-indictment checks] only as they go to the indication of Mr. Rubin's intent and knowledge."

Because receipt in evidence of the non-indictment checks did "not engender the 'unfair prejudice' against which Rule 403 is directed," *United States v. Diaz*, 878 F.2d 608, 615 (2d Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540, (1989), Judge Carter acted well within his discretion in admitting them. Judge Carter's ruling to admit the non-indictment checks only came after the defense revealed that Rubin would be disputing knowledge of the fraudulent endorsements. It thus exemplified the able judge's "conscientious assessment" of unfair prejudice and probative value that Rule 403 mandates. *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980).

### C. *The Limiting Instruction*

Finally, Rubin contends that the district court gave an erroneous limiting instruction to the jury on how to consider evidence regarding the non-indictment checks. Judge Carter told the jury that the nine non-indictment checks could only be considered if the jury determined that "[Rubin] in fact committed bank fraud with respect to [the indictment checks]." Only then, Judge Carter instructed, could the jury consider the non-indictment checks "as to whether he committed the bank fraud with knowledge and intent." While the limiting instruction was not a model of clarity and standing alone would have been a source of some confusion, we find any error occasioned by the instruction to be harmless beyond a reasonable doubt. Taken literally, the limiting instruction forbade the jury from considering the non-indictment checks at all until it

had already determined Rubin's guilt—that he had "in fact committed bank fraud." Thus, we fail to see how any confusion in the instruction could have prejudiced Rubin.

■ Furthermore, we reject Rubin's suggestion that the instruction may have led to his being convicted without the necessary determination of knowledge and intent. The district court reiterated in the jury charge that "the government must establish beyond a reasonable doubt ... that the defendant knowingly and willfully engaged in this scheme or artifice to defraud with knowledge of its fraudulent nature and with the specific intent to defraud." This instruction sufficiently clarified the requisite mental state that the jury had to find before convicting Rubin. Under all of the circumstances, the limiting instruction did not deprive Rubin of a fair trial. *See Pope v. Illinois,* 481 U.S. 497, 502–03, 107 S.Ct. 1918, 1921–22, 95 L.Ed.2d 439 (1987).

## II. *Remaining Challenges*

■ We can easily dispose of Rubin's remaining challenges. First, he argues that the district court erred in not striking certain jurors for cause because of answers they gave during voir dire. He claims that this error forced his defense counsel to waste peremptory challenges to strike these individuals. The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an abuse of this discretion. *See United States v. Maldonado–Rivera,* 922 F.2d 934, 970 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991); *United States v. Ploof,* 464 F.2d 116, 118 n. 4 (2d Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). Moreover, to prevail on his claim, Rubin must also establish that the jury that eventually convicted him was not impartial. *See United States v. Towne,* 870 F.2d 880, 885 (2d Cir.), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989). After a thorough review of the voir dire colloquy, we are satisfied that the district court did not abuse its discretion in refusing to strike the disputed jurors for cause; each juror gave full and frank answers and indicated that they would

judge Rubin's case fairly. More importantly, Rubin cannot prevail because he has not made the requisite showing that the jury eventually empaneled was not impartial. Under this court's precedents, without such a showing his claim must fail. *See Towne,* 870 F.2d at 885; *United States v. Brown,* 644 F.2d 101, 104–05 (2d Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981).

■ Second, Rubin attacks the district court's decision to exclude him from the jury charge conference attended by his attorney, the prosecutor, and the district court. He claims that this deprived him of his due process right to be present at all stages of his trial. *See United States v. Fontanez,* 878 F.2d 33, 35 (2d Cir.1989) ("The right to be present at all stages of one's trial constitutes a foundational principle underpinning the entire law of criminal procedure."); *see also* Fed.R.Crim.P. 43(a). However, the defendant has no constitutional or statutory right to be present at a charge conference dealing only with the legal questions involved in formulating a proper set of jury instructions. *See United States v. Graves,* 669 F.2d 964, 972–73 (5th Cir.1982) ("A defendant does not have a federal constitutional or statutory right to attend a conference between the trial court and counsel concerned with the purely legal matter of determining what jury instructions the trial court will issue."); Fed. R.Crim.P. 43(c)(3) (excusing the presence of the defendant at "a conference or argument upon a question of law"). Consequently, Rubin cannot claim that the charge conference proceedings in his absence was a denial of due process.

We have carefully reviewed the defendant's further challenges to the jury charge and his sentence and find them to be without merit. Accordingly, the judgment of conviction and sentence is affirmed.