**UNITED STATES of America,
Appellee,**

v.

**Ricardo MORALES, aka "Ichi,"
and Jesus Mendez, aka "G,"
Defendants–Appellants.**

**Docket Nos. 97–1494, 97–1496.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1999.

Decided July 26, 1999.

Elizabeth Glazer, Assistant United States Attorney for the Southern District of New York, New York, NY (Mary Jo White, United States Attorney, Craig A. Stewart, Assistant United States Attorney, of counsel), for Appellee.

Allan P. Haber, New York, NY, for Defendant–Appellant Jesus Mendez.

Jesus Mendez, Beaumont, TX, pro se.

Paul J. McAllister, New York, NY, for Defendant–Appellant Ricardo Morales.

Before: CABRANES and STRAUB, Circuit Judges, and McCURN, District Judge.*

STRAUB, Circuit Judge:

Ricardo Morales and Jesus Mendez appeal from judgments entered on August 15, 1997 following a jury trial in the United States District Court for the Southern District of New York (Denny Chin, *Judge* ), convicting them of racketeering, Hobbs Act, and firearms violations, and sentencing them principally to terms of imprisonment of life plus 105 years and life plus 125 years respectively.

On appeal, Morales and Mendez raise several challenges to their convictions. They contend, *inter alia,* that the evidence was insufficient to support the racketeering and racketeering-dependent convictions because the government failed to establish a single racketeering enterprise that lasted from 1987 to 1996. Alternatively, they argue that their convictions for a Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy should be reversed because there is a variance between the single RICO conspiracy alleged and the proof offered at trial. The defendants also argue that prejudicial spillover of the evidence from the challenged racketeering and racketeering-dependent counts requires that we upset the other convictions. Mendez further contends that the District Court abused its discretion in not striking three jurors for cause during jury selection. In addition, he argues that the District Court abused its discretion by conditioning admission of a photograph of Mendez on a proposed jury instruction.

For the reasons given below, we conclude that the evidence was insufficient to establish the existence of a racketeering enterprise lasting from 1987 to 1996 and therefore reverse the racketeering and racketeering-dependent convictions. We affirm the Hobbs Act convictions and several of the firearms convictions, but remand for resentencing on those counts in light of our decision to reverse the other convictions.

## BACKGROUND

A twenty-six count superseding indictment was filed against Morales and Mendez on December 3, 1996.[1] Five counts of this indictment were redacted before trial.

---

* The Honorable Neal P. McCurn, of the United States District Court for the Northern District of New York, sitting by designation.

1. The superseding indictment followed an initial indictment, filed April 29, 1996, which named as defendants Morales, Mendez, Angel Diaz, and Jose Ruiz. The initial indictment charged Morales, Mendez, and Angel Diaz with participating in a more limited version of the same racketeering enterprise charged in the superseding indictment.

Counts One and Two of the redacted superseding indictment charged Morales and Mendez with participating and conspiring to participate in a racketeering enterprise through predicate acts of robbery and murder in violation of the RICO statute, 18 U.S.C. § 1962(c)-(d). The racketeering enterprise, the "Park Avenue Boys," is alleged to have lasted from 1987 to 1996. The predicate acts alleged include conspiracy to rob and robbery of the following entities and individuals in the Bronx, New York (with one exception, as noted): a grocery store at 374 East 188th Street on December 22, 1987; a grocery store at 2537 Grand Concourse on September 21, 1988; a grocery store at 917 Castle Hill on September 25, 1988; a grocery store at 375 Pleasant Avenue on December 11, 1995 (this act occurred in northern Manhattan rather than the Bronx); the Franklin Grocery at 1721 East 174th Street on January 3, 1996; an individual near 34½ West 183rd Street on February 25, 1996; the Montary Restaurant at 336 East 188th Street on February 28, 1996; an individual near 2721 Morris Avenue on March 9, 1996; an individual near 178th Street and Arthur Avenue on March 14, 1996; and an individual near 184th Street and Grand Avenue on March 14, 1996. The other predicate acts alleged are the felony-murder of the store owner and the attempted murder of a store employee during the course of the robbery at 917 Castle Hill, the felony-murder of Officer Kevin Gillespie of the New York City Police Department ("NYPD") on March 14, 1996, and the attempted murders of two other NYPD officers, Edward Brandon and Anthony Russo, on March 14, 1996.

Counts Three through Eight charged Morales and Mendez with obstructing commerce and conspiring to obstruct commerce by robbing stores and individuals in violation of the Hobbs Act, 18 U.S.C. § 1951. These charges relate to the robberies alleged at or near 375 Pleasant Avenue, the Franklin Grocery, and 34½ West 183rd Street.

Counts Nine and Ten charged the defendants with violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959—specifically, assault with a dangerous weapon on February 25, 1996 and robbery and felony-murder on March 14, 1996. Count Eleven charged Mendez alone with other violent crimes in aid of racketeering—specifically, attempting to murder Officers Brandon and Russo on March 14, 1996.

Counts Twelve through Eighteen charged violations of 18 U.S.C. § 924(c), which prohibits using or carrying a firearm during and in relation to any crime of violence or drug trafficking crime for which the person may be prosecuted in a U.S. court. Specifically, Counts Twelve through Fourteen charged that the defendants used and carried firearms during and in relation to the acts of racketeering and the Hobbs Act violations that occurred at or near 375 Pleasant Avenue, the Franklin Grocery, and 34½ West 183rd Street. Counts Fifteen through Seventeen charged that the defendants used and carried firearms during and in relation to the acts of racketeering that occurred near 2721 Morris Avenue, 178th Street and Arthur Avenue, and 184th Street and Grand Avenue. Count Eighteen charged Morales and Mendez with using and carrying a firearm during and in relation to the felony-murder of Officer Gillespie on March 14, 1996. Count Nineteen charged Mendez alone with using and carrying a firearm during and in relation to the attempted murders of Officers Brandon and Russo on March 14, 1996.

Counts Twenty and Twenty–One charged Morales and Mendez respectively with possessing firearms on March 14, 1996 as convicted felons in violation of 18 U.S.C. § 922(g)(1).

Trial by jury began on April 7, 1997. The evidence presented at trial, taken in the light most favorable to the government, showed the following.

Morales, Mendez, and Angel Diaz were members of a violent group called the "Park Avenue Boys" or "Webster Avenue Posse" that operated primarily in the area around 187th Street and Webster Avenue in the Bronx. During 1987 and 1988, the Park Avenue Boys committed a series of armed robberies of grocery stores in this area. During one such robbery at 917 Castle Hill Avenue, the leader of the group, Jose Aponte, shot and killed the store's owner, and Morales shot and wounded a store employee. A few days after the last in the series of robberies, Aponte killed himself as the police attempted to arrest him. At or around the same time, the remaining members of the Park Avenue Boys went to prison.

During the period of their incarceration, Morales, Mendez, and Diaz were permitted to place telephone calls to up to fifteen telephone numbers of their own choosing. Both Diaz and Mendez requested authorization to call one number in common, which Diaz ascribed to "Michelle Diaz" and Mendez ascribed to "Mia Lisa Mendez." The same number appeared in a telephone book taken from Diaz at the time of his arrest next to "G," one of Mendez's nicknames. While incarcerated, Morales and Diaz also requested authorization to call a common number. Following Mendez's release, Diaz placed Mendez's number on his list of authorized calls.

Between May and October 1995, Morales, Mendez, and Diaz were all released from prison. In December 1995, Morales and Mendez committed the first in a series of armed robberies in the same neighborhood that the Park Avenue Boys had victimized during the late eighties. Like the earlier crimes, some of these robberies took place in or near grocery stores. According to the government's evidence, the final two robberies in the series took place on March 14, 1996 and culminated in the felony-murder of Officer Gillespie and the attempted murders of Officers Brandon and Russo as Morales, Mendez, and Diaz sought to evade the police.

As part of the government's case, the District Court admitted into evidence redacted versions of written statements and videotaped confessions made by each of the defendants while in police custody on March 15, 1996.

On May 1, 1997, the jury returned its verdict. Morales was convicted on Counts One and Two—the substantive RICO and RICO conspiracy charges—and on thirteen other counts involving Hobbs Act violations, violent acts in aid of racketeering, the use and carrying of a firearm during and in relation to a crime of violence, and the possession of a firearm after having been convicted of a felony. Mendez was convicted on Counts One and Two—the substantive RICO and RICO conspiracy charge—and on fifteen other counts involving Hobbs Act violations, violent acts in aid of racketeering, the use and carrying of a firearm during and in relation to a crime of violence, and the possession of a firearm after having been convicted of a felony. The jury found that the government had proven all of the predicate acts alleged in Counts One and Two except the conspiracy to rob and robbery of 375 Pleasant Avenue and the conspiracy to rob an individual near 178th Street and Arthur Avenue. The jury acquitted both Morales and Mendez of robbery, conspiracy to rob, and the use and carrying of guns during the robbery of the grocery store located at 375 Pleasant Avenue, as charged in Counts Three, Four, and Twelve respectively.

Following the convictions, the District Court granted Morales's motion for a judgment of acquittal of the robbery of the Montary Restaurant, as alleged as a predicate act in Counts One and Two. *See United States v. Morales*, 974 F.Supp. 315, 320–21 (S.D.N.Y.1997). The District Court granted the motion because the government failed to produce sufficient evidence of the commission of the predicate act aside from Morales's uncorroborated extrajudicial confession. *See id.* (citing *Opper v. United States*, 348 U.S. 84, 89–90, 75 S.Ct. 158, 99 L.Ed. 101 (1954)).

On August 13, 1997, the District Court sentenced Morales to a term of imprisonment of life plus 105 years and Mendez to a term of imprisonment of life plus 125 years. It also imposed a five-year term of supervised release and a special assessment on each of the defendants.

Morales and Mendez are currently serving their sentences. They timely filed notices of appeal.

## DISCUSSION

### I. *Sufficiency of the Evidence*

■ Morales and Mendez challenge the sufficiency of the evidence proving the existence of the racketeering enterprise charged in the indictment. The defendants bear a heavy burden in making this challenge. "[W]e must consider the evidence 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and [we] may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998) (quoting *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996)) (second alteration in original). If the jury's verdict is supported by substantial evidence, it must be allowed to stand. *See United States v. Polanco*, 145 F.3d 536, 539 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 803, 142 L.Ed.2d 664 (1999). "Nevertheless, a conviction cannot stand when the Government has not introduced sufficient evidence to sustain each essential element of the crime charged beyond a reasonable doubt." *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir.1999).

■ The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4), and the statute prohibiting violent crimes in aid of racketeering defines "enter-

prise" in similar terms, *see* 18 U.S.C. § 1959(b)(2). A racketeering enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

■ The defendants argue that the government's evidence was insufficient to prove the existence of an ongoing organization lasting from 1987 to 1996 because any organization that existed in the 1980s effectively disbanded when all of its members died or went to prison in 1988. They assert that the seven-year hiatus in activity during the defendants' incarceration signaled the end of any existing enterprise. In response, the government argues that the defendants' rapid resumption of armed robberies after their release shows that they had a continuing understanding during their incarceration that they would resume their criminal activities after leaving prison. The government also relies upon the similarity of the defendants' activity before and after their incarceration—that is, the fact that during both periods the defendants engaged in armed robberies of store owners and employees around 187th Street and Webster Avenue in the Bronx. Finally, the government argues that the jury could have inferred the existence of a continuing enterprise from the common telephone numbers that Morales, Mendez, and Diaz requested authorization to call while incarcerated and the fact that Diaz added Mendez's number to his list of authorized telephone numbers upon Mendez's release from prison.

■ In considering these arguments, we note that incarceration of all members of a racketeering enterprise does not automatically signal the end of that enterprise. *Cf. United States v. Coonan*, 938 F.2d 1553, 1560 (2d Cir.1991) (rejecting argument that RICO enterprise ceased to exist upon leader's imprisonment because "even while in jail [he] continued to act as leader

of the [enterprise] and the [enterprise's] criminal activities continued without significant disruption"), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). Instead, we must examine the facts of each case to determine whether the imprisonment of enterprise members terminates an ongoing racketeering enterprise. Such an approach is analogous to the established rule that "arrest or incarceration *may* constitute a withdrawal from a conspiracy, [but] it does not follow that in every instance it *must.*" *United States v. Agueci,* 310 F.2d 817, 839 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); *see also United States v. Salameh,* 152 F.3d 88, 150 (2d Cir.1998) (per curiam) ("Whether a conspirator's imprisonment constitutes a withdrawal 'must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence.'") (quoting *United States v. Panebianco,* 543 F.2d 447, 454 n. 5 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977)), *cert. denied,* —— U.S. ——, 119 S.Ct. 885, 886, 142 L.Ed.2d 785 (1999); *United States v. Borelli,* 336 F.2d 376, 389 (2d Cir.1964) (Friendly, J.) ("Neither authority nor reason would suggest that imprisonment necessarily shows a withdrawal ...."), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

Applying this approach to the record before us, we conclude that the evidence was insufficient to prove that the Park Avenue Boys enterprise existed for the duration alleged in the indictment. The government did not present sufficient evidence to show that the enterprise continued during the seven-year period that the defendants were incarcerated; indeed, the telephone authorization evidence presented by the government does not even establish that the defendants ever called one another or a mutual contact while in prison. Given the length of incarceration and the dearth of evidence of activity between 1988 and 1995, no rational jury could have found beyond a reasonable doubt the existence of an enterprise lasting from 1987 to 1996.

Further, we need not consider whether the evidence was sufficient to support a finding of a shorter racketeering enterprise. The indictment charged a single nine-year enterprise, and the jury was instructed that it could only convict on the racketeering and racketeering-dependent counts if it found that the specific enterprise set out in the indictment existed. *See, e.g.,* Trial Transcript at 1360–63 (quoting Count One of the redacted superseding indictment); *id.* at 1364 ("To prove that the defendant you are considering is guilty of the RICO charge contained in Count 1, the government must prove beyond a reasonable doubt ... that the criminal enterprise set out in the indictment existed ....."); *id.* at 1367 ("[I]f you find that the Park Avenue Boys were, in fact, a group of people characterized by [*inter alia*] core personnel who functioned as a continuing unit during the time frame charged in the indictment, then you may find that an enterprise existed."); *id.* at 1409 ("[T]he first, second and fourth elements of the RICO conspiracy offense are identical to the same elements of the substantive RICO charge."); *id.* at 1429 ("As you consider each of Counts Nine Through Eleven, the first element that the government must prove beyond a reasonable doubt is that the enterprise alleged in the indictment existed. I have already discussed the enterprise in connection with Counts One and Two and you should apply those instructions here."). The jury's verdict on those counts is therefore necessarily based on a finding that we have concluded is not supported by the evidence.

Accordingly, because the government failed to prove the existence of the racketeering enterprise alleged in the indictment, we reverse the substantive RICO convictions (Count One), the RICO conspiracy convictions (Count Two), and the convictions for violent crimes in aid of racketeering (Counts Nine, Ten, and Eleven). We also reverse the convictions for

using and carrying a firearm during and in relation to a crime of violence where the only predicate crime of violence alleged is an act of racketeering. Specifically, we reverse the convictions for using and carrying a firearm during and in relation to the following acts of racketeering: the conspiracies to rob and robberies of the individuals near 2721 Morris Avenue, 178th Street and Arthur Avenue, and 184th Street and Grand Avenue, the felony-murder of Officer Gillespie, and the attempted murders of Officers Brandon and Russo (Counts Fifteen, Sixteen, Seventeen, Eighteen, and Nineteen). We do not reverse the convictions for using and carrying a firearm during and in relation to the conspiracies to rob and robberies of the Franklin Grocery and the individual near 34½ West 183rd Street (Counts Thirteen and Fourteen) because Hobbs Act violations remain as predicate crimes of violence for those convictions.

Because we are reversing the racketeering and racketeering-dependent convictions, we need not consider the defendants' alternative arguments as to why those convictions should be reversed, including their claim that there is a variance between the indictment and the proof at trial as to the RICO conspiracy.

## II.  *Prejudicial Spillover*

■ The remaining counts of conviction are for Hobbs Act violations (Counts Five, Six, Seven, and Eight), possession and use of firearms during and in relation to a crime of violence (Counts Thirteen and Fourteen), and possession of a firearm as a convicted felon (Count Twenty as to Morales and Count Twenty–One as to Mendez). Morales and Mendez argue that they must receive a new trial on these counts due to prejudicial spillover of the evidence from the invalidated racketeering and racketeering-dependent counts. We disagree.

In assessing a claim of prejudicial spillover from dismissed counts, this Circuit looks to several factors in determin-

ing whether the totality of the circumstances requires reversal of some or all of the remaining counts. First, we look at whether the evidence on the vacated count[s] was of such an inflammatory nature that it would have tended to incite or arouse the jury into convicting the defendant[s] · on the remaining counts. . . . .

Second, we look at whether the evidence and facts pertaining to the [vacated] count[s] are similar to or different from those relating to the other counts. In cases where the vacated and remaining counts emanate from similar facts, and the evidence introduced would have been admissible as to both, it is difficult for a defendant to make a showing of prejudicial spillover. By the same token, where the vacated and remaining counts arise out of completely distinct fact patterns, and the evidence as to both counts is readily separable, there is also no prejudicial spillover. Thus, a defendant is likely to make a successful argument of prejudicial spillover only in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts. . . .

. . . .

Third, we make a general assessment of the strength of the government's case on the remaining counts.

*United States v. Wapnick,* 60 F.3d 948, 953–54 (2d Cir.1995) (citations and internal quotation marks omitted), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996), 518 U.S. 1021, 116 S.Ct. 2556, 135 L.Ed.2d 1075 (1996).

■ Applying these principles to the instant case, we see no prejudicial spillover of the evidence from the racketeering and racketeering-dependent charges. First, there is no reason to believe that the evidence on the reversed

counts aroused the jury into convicting the defendants. Although the fact that a RICO count has been reversed often suggests prejudice, *see United States v. Tellier,* 83 F.3d 578, 582 (2d Cir.), *cert. denied,* 519 U.S. 955, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996), it does not suffice to establish prejudice, *see United States v. Vebeliunas,* 76 F.3d 1283, 1294 (2d Cir.), *cert. denied,* 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996). This is particularly true in a case such as this, where the District Court carefully instructed the jurors that they should not be influenced by the use of the word "racketeering" in determining whether the government has proven the defendants' guilt. *See Vebeliunas,* 76 F.3d at 1294. Moreover, in the instant case, the evidence that the government presented on the reversed counts was, as a general matter, no more inflammatory than the evidence that it presented on the remaining counts because all of the evidence related to violent armed robberies.

With respect to the second factor, the reversed and remaining counts stem from many of the same facts, and most of the evidence introduced was admissible as to the remaining counts. Thus, even if the racketeering and racketeering-dependent counts had not been charged, the jury would have heard evidence about the robberies at 375 Pleasant Avenue, the Franklin Grocery, and 34½ West 183rd Street due to the Hobbs Act charges. Additionally, much of the evidence related to the events of March 14, 1996 would have been admissible even if the reversed counts had never been charged because the defendants were charged with possession of firearms as convicted felons on that date.

█ It is also noteworthy that the jury acquitted Morales and Mendez of the Hobbs Act and weapons charges related to the 1995 robbery of the Pleasant Avenue grocery store (Counts Three, Four, and Twelve) and found that the government had failed to prove as predicate acts the conspiracy to rob and robbery of the Pleasant Avenue grocery and the conspiracy to rob an individual near 178th Street and Arthur Avenue. Partial acquittal of a defendant strongly indicates that there was no prejudicial spillover. *See United States v. Casamento,* 887 F.2d 1141, 1153 (2d Cir.1989) (discussing spillover across defendants), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), 495 U.S. 933, 110 S.Ct. 2175, 109 L.Ed.2d 504 (1990). We therefore have no reason to doubt that the jury followed the District Judge's instruction to consider each charge separately.

As to the third factor, the government presented a strong case on the remaining counts of conviction. The detailed testimony of Franklin Vargas, the owner of the Franklin Grocery, provided ample support for the Hobbs Act and firearms convictions related to the armed robbery of the Franklin Grocery on January 3, 1996. In addition, the eyewitness testimony of Bryan Wilson and Grant Summerville established that the defendants shot and robbed Wilson as he was closing up his shop on West 183rd Street on February 25, 1996. Finally, there was overwhelming evidence in support of the defendants' convictions for possessing firearms on March 14, 1996 as convicted felons, including the defendants' own confessions and eyewitness testimony.

Because all three of the relevant factors indicate no prejudicial spillover of the evidence from the invalidated counts, Morales and Mendez are not entitled to receive a new trial on the remaining counts.

### III. *Voir Dire*

Mendez next argues that the District Court should have granted three challenges for cause that he raised during jury selection. The factual bases for the three challenges were as follows: the first challenged juror worked as a corrections officer in New York City, the second had a brother who was an agent with the Federal Bureau of Investigation and a brother-in-law in the NYPD, and the third served as a peace officer in connection with his

job as a toll collector and had a daughter who was a civilian employee of the NYPD. Although all three of the challenged jurors stated that they could be impartial, Mendez argues that the District Court should have presumed partiality because they "either were themselves law-enforcement officers or were so closely related to law enforcement that their impartiality was inherently suspect." We disagree.

"The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an abuse of this discretion." *United States v. Rubin,* 37 F.3d 49, 54 (2d Cir.1994). Upon a thorough review of the voir dire colloquy, we find no abuse of discretion in the instant case. The jurors' voir dire answers do not show any actual bias. *See United States v. Torres,* 128 F.3d 38, 43 (2d Cir.1997) (defining actual bias as "bias-in-fact" or "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998). Additionally, despite the fact that some of the charges against the defendants related to the felony-murder and attempted murders of police officers, the challenged jurors' connections to law enforcement in this case do not, standing alone, suffice to establish implied bias or " 'bias conclusively presumed as a matter of law.' " *Id.* at 45 (quoting *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936)); *see also United States v. Brown,* 644 F.2d 101, 105 (2d Cir.) ("A defendant must raise a contention of bias from the realm of speculation to the realm of fact.") (citations and internal quotation marks omitted), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); *United States v. Haynes,* 398 F.2d 980, 985–86 (2d Cir.1968) (holding that jurors who had previously served on cases involving the same government witnesses were not impliedly biased), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969).

Moreover, even if Mendez could show bias on the part of the challenged jurors, we would reject Mendez's claim because he used peremptory challenges to strike all three. As we have previously observed,

peremptory challenges are neither mandated by the Constitution nor of constitutional dimension as such. Thus, so long as the jury which was *ultimately selected* was fair and impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the [S]ixth [A]mendment was violated.

*United States v. Towne,* 870 F.2d 880, 885 (2d Cir.) (citations omitted), *cert. denied,* 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d 1010 (1989); *see also Rubin,* 37 F.3d at 54. Mendez's voir dire challenge thus fails because he has neither shown bias on the part of the challenged jurors nor demonstrated any impartiality on the part of the jurors who were actually selected.

## IV. Mendez's Photograph

Mendez also contends that the District Court improperly conditioned the admission of a photograph taken of him on the night that he was arrested on a jury charge clarifying that Mendez had not been struck in the face by the police prior to the time that the photograph was taken. The proposed charge was based on Mendez's unequivocal testimony at the suppression hearing as to the timing of the photograph. Mendez opted not to introduce the photograph and now argues that the District Court's ruling was inconsistent with *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). We again disagree.

In *Simmons,* the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at

394, 88 S.Ct. 967. The Supreme Court's holding in *Simmons* was not implicated in the instant case because the government did not seek to use Mendez's suppression hearing testimony to establish his guilt, but merely to clear up potential confusion about the timing of the photograph with respect to Mendez's allegations of police brutality. *Cf. United States v. Manning,* 56 F.3d 1188, 1199 (9th Cir.1995) (finding no error in admission of suppression hearing testimony to rebut defendant's motion to strike on ground that a document had not been properly authenticated). The District Court's decision to condition the admission of Mendez's photograph on its proposed instruction was therefore not an abuse of its discretion.

### V. *Remaining Issues*

We have carefully reviewed the defendants' further challenges to the Hobbs Act and remaining firearms convictions and find them to be without merit.

Because the sentences imposed on the reversed and remaining counts are or may be interdependent, the District Court should resentence the defendants on the remaining counts and should treat the resentencing as a *de novo* sentencing. *See United States v. Atehortva,* 69 F.3d 679, 685 (2d Cir.1995) ("When a defendant challenges convictions on particular counts that are inextricably tied to other counts in determining the sentencing range under the guidelines, the defendant assumes the risk of undoing the intricate knot of calculations should he succeed."), *cert. denied,* 517 U.S. 1249, 116 S.Ct. 2510, 135 L.Ed.2d 199 (1996); *cf. United States v. Mata,* 133 F.3d 200, 202 (2d Cir.1998) (per curiam) (finding no double jeopardy or due process violation where vacatur of the petitioner's conviction under 18 U.S.C. § 924(c) led to resentencing on an interdependent sentence for a narcotics trafficking offense).

### CONCLUSION

For the foregoing reasons, we reverse the racketeering convictions and the con-

victions that are dependent upon the racketeering convictions, but affirm all other convictions. We also vacate the sentences imposed on the remaining counts of conviction and remand for resentencing consistent with this opinion.