**UNITED STATES of America**

**v.**

**Mohammad DOLAH and Marshall Weinberg, Defendants.**

**No. 98 CR. 984(RLC).**

United States District Court, S.D. New York.

Aug. 18, 1999.

Mary Jo White, United States Attorney, New York, by David Raymond Lewis, Kim A. Berger, Assistant United States Attorneys, for Plaintiff.

Nalven & Schacht, New York City, by Alexei Schahct, for Defendant Dolah Mohammad.

Joseph A. Bondy, New York City, for Defendant Marshall Weinberg.

## OPINION

ROBERT L. CARTER, District Judge.

Mohamad Dolah and Marshall Weinberg were charged, in an eleven count indictment, along with William Stern, Nelson Walker, Jeremy Crittenden and Eric Martinez, with conspiracy to commit fraud in connection with the offer and sale of the common stock of ConnecTechnologies, Inc. and Vital Signs, Inc. from July, 1997 to February, 1998 in violation of Title 18, United States Code, § 371, and fraud in connection with the offer and sale of the common stock of the two corporations in violation of Title 18, United States Code, §§ 77q and 77x. Only Dolah and Weinberg went to trial; the other defendants pleaded guilty to one or more counts. The trial commenced on April 26, 1999, and concluded on May 14, 1999, with a jury verdict convicting defendants on the remaining ten counts of the indictment.[1]

Weinberg moves for a new trial on the grounds that the court committed reversible error in refusing to strike three jurors for cause, in curtailing defendants' cross examination of government witnesses as to their good faith belief that they were engaged in legitimate transactions and their reliance on the good faith of various persons not charged in the indictment, refusing to read a theory of the defense charge, disparaging counsel throughout the trial and in taking a partial verdict from the jury. Dolah joins in the motion as to the court's refusal to strike three jurors for cause.

## DETERMINATION

The testimony supporting the jury verdict was straight forward, establishing beyond a reasonable doubt that defendants had knowingly engaged in a scheme to interest susceptible members of the public into buying worthless common stock of ConnecTechnologies, Inc. and Vital Signs, Inc., and in knowingly offering and selling them such worthless common stock of the corporations with the intent to defraud in violation of Title 18, United States Code, §§ 77(q) and 77(x).

Dolah elected to take the witness stand, and, by his performance, doomed whatever hopes he might have entertained that the jury might find that the government had not met its beyond a reasonable doubt requirement. He told blatant and transparent lies on the witness stand and made foolishly absurd assertions, all of which did not aid his cause. Weinberg did not testify.

### a. Jury Selection

When a panel of 36[2] prospective jurors was initially seated in the jury box, the court announced that the trial was expected to last three weeks and asked whether there was anyone who would find it an undue hardship to serve on the jury for three weeks. As the record will show a relatively large proportion of the jury panel sought to be excused. (Tr. 6–41). Those seeking to be excused were examined at the sidebar—some were excused for reasons the court regarded as legitimate, and others were not since the given

---

1. At the conclusion of the trial, count seven of the indictment was dismissed on the government's motion. (Tr. 1378–79). "Tr." refers to the trial transcript.

2. The total called is equal to the number of jurors and alternatives to be selected, plus the number of jurors equal to the peremptory challenges allowed.

reasons did not in the court's view justify their being dismissed. At the conclusion of this phase of the proceedings, with 36 prospective jurors once again seated in the jury box, the court completed the voir dire examination. In the course of the examination, several prospective jurors had stated that they did not think they could be fair. They were then examined in the court's robing room. (Tr. 61–66). After the examination in the robing room, the court refused to excuse Ernesto Santa, Margo Zomback, and Paul Grandpre for cause which defendants now challenge as reversible error.

The record shows conclusively that these three prospective jurors had no desire to serve on the jury and offered a variety of reasons as the bases for being excused. In his initial examination at the sidebar, Ernesto Santa asked to be excused because he had two children of seven years and 16 months. Taking care of them was "too much on [his wife]." (Tr. 17). When the court refused to excuse him, he said "all right" and asked how many days the trial was expected to last. (Tr. 18). When examined individually after being seated, Mr. Santa said he had been involved in class action suits against companies where there had been stock manipulation and that he knew a Marshall Weinberg but not the defendant. It was confirmed by defense counsel that the Weinberg Santa knew were not related to the defendant. (Tr. 39–40). Thereafter, he answered "yes" to the question "did he think he could be fair?" (Tr. 57). It appears that Mr. Santa was called into the robing room for further examination by mistake. The court and counsel must have confused him with someone else. At any rate, in the robing room, Mr. Santa voiced a bias against Arabs as a basis for not serving, a sentiment that he did not express during the voir dire examination in open court.

When Paul Grandpre was first seated, replacing a juror who had been excused (Tr. 21), he was asked if he had a problem. He replied that he did not. (Id.) When individually examined, Mr. Grandpre, an investment banker, married, with two children and a masters degree in business administration, said he might have trouble being fair because his parents were victims of overzealous brokers. (Tr. 46).

At her sidebar examination, Margo Zomback, an elementary school teacher, sought to be excused since standardized tests were scheduled to be given in her school. She was told she could not be excused for that reason. She then said she was scheduled for gum surgery and was told that was a second thought, and that she could not be excused for that reason. (Tr. 11–12). When examined individually and asked if she could be fair, she replied that she did not think so. (Tr. 45).

Ms. Zomback was the first of the three to be examined in the robing room. (Tr. 72). Excerpts from that examination are set out below.

BY THE COURT:

Q. I think, Ms. Zomback, you had a problem about being fair?

A. I just don't know that I can be fair. I just have a sense of feeling one-sided.

Q. Why?

A. You want to know how I feel? Do you care if I feel that they are guilty or not?

Q. No, but the point I want to know, you say you have a sense of feeling on one side. All you have before you right now is you have seen the people and you heard what the charges are.

A. I just have a sense of seeing FBI men and the government making a case, I see a huge shopping cart full of folders, which I am assuming, whether right or wrong, I am assuming that that has to do with evidence in the case.

Q. You have never been on a jury before?

A. Have I been selected for a jury before? No.

Q. Any criminal case you are selected for, even if it is a one-day or two-day case, you might find the government with charts and FBI persons. That's nothing.

A. I am trying to just be honest, sir. You asked me do I have any prejudices, and I had to admit that I did.

My sons and my husband are all in the business world, as far as banking and securities. I know that they are scrupulously honest.

I had a friend years ago who served time for Medicaid fraud, and the FBI was in on the case.

I just have sense that these young men are guilty. Not that I—if you put me on the jury I would try my best to see both sides.

Q. You strike me as being a very intelligent woman.

A. Thank you.

Q. You do know that your obligation is to make your decision based upon the evidence presented to you?

A. If I am on this jury, I promise you I will listen to the evidence and I will make my judgment based on the evidence that is shown to me. But if you ask me if I have a sense or a prejudice beforehand, I would have to say—you asked me to be honest and I am being honest. Would I serve on the jury? Of course I would serve on the jury, and would I listen and try to be fair, of course I would.

Q. The point is, that's all I can ask for you to do, to be fair, to listen to the evidence and make your decision based on the evidence.

A. I see two young men out there, I wouldn't want to jeopardize them unless there was a reason. But on the other hand, you asked me if I felt this way in advance, and that's as honest as I can be.

Q. Well, you have been very honest, and you have been frank, and I appreciate it. Thank you very much.

A. Thank you.

(Juror leaves.)

(Tr. 72–74).

Mr. Grandpre was interviewed next in the robing room. (Tr. 74). He repeated the concerns expressed in open court about his parents being hurt by an overzealous broker as the basis for his belief that he would have difficulty being fair. He spoke of Ivan Boesky and Michael Milken and the need to make examples "of some of these people." (Tr. 75). After being told that his obligation was to analyze the evidence and on that basis make a fair determination, he replied, "I understand. I am just trying to be honest in terms of this type of business, it is very difficult for me to remain objective." The colloquy continued with the court asking, "if the evidence is such that the government has not proved these men to have done anything wrong, beyond a reasonable doubt, would you come in with a verdict of not guilty?" His response of "I am not sure I could" was not found believable by the court: "I am not going to accept that. . . . I am not going to accept that." I think that Mr. Grandpre is looking at three weeks and trying to find a way out. I am not going to excuse him period. (Tr. 76).

Mr. Santa was next (Tr. 77) and for the first time expressed a bias, saying he was against Arabs. After counsel confirmed that Dolah was an Arab, the following colloquy took place:

BY THE COURT:

Q. Are you telling me that you would be on a jury and if a man is an Arab, and you have to decide the case based on the evidence in the case, . . . if the evidence in the case was not sufficient to convict, because he is an Arab, you would convict him?

A. No, I don't think so.

Q. Of course you wouldn't. You judge(sic) the case based on the evidence, would you not?

A. Right, by the evidence.

Q. And you—whatever the evidence is in this case, whether it is sufficient to if you are on this jury, to convict this man or let him go, you would weigh the evidence, correct?

A. Weigh the evidence, yes.

Q. Okay, thank you.

A. That's it.

Q. Yes.

(Tr. 77–78).

The defendants' challenge of the three for cause was rejected (Tr. 80–81), and defendants used three of their peremptory challenges to excuse Ms. Zomback, Mr. Grandpre, and Mr. Santa.

In response to the government's inquiry as to whether the court's rejection was its disbelief in what the jurors had said, the answer was that the three had indicated that "they were going to weigh the evidence and ... make the decision based on the evidence." (Tr. 81). The record is clear, however, that in Mr. Grandpre's case, the court had refused to believe or accept his statement that he was not sure he would base his decision on the evidence. (Tr. 76). Apparently, the court had forgotten that Mr. Grandpre, unlike the other two, had not said that he would weigh the evidence and base his decision on the evidence, and that his response of doubt that he would find the man not guilty even if the evidence called for it was not credited by the court.

■ The court rejects out of hand any claim that it was required to excuse Ms. Zomback and Mr. Santa for cause. Both did express a predisposition to bias: Ms. Zomback against both defendants ("I have a sense of felling one sided") (Tr. 72); "a sense of seeing FBI men and the government making a case" (id.); "a sense that these young men are guilty"(Tr. 73); and Mr. Santa against Dolah because he is an Arab—"I am against the Arabs" (Tr. 78). However, when reminded of their obligation as jurors to weigh the evidence and base their decision on the evidence, both agreed that they would do so. Ms. Zom-

back stated, "Of course I would serve on the jury, and would I listen and try to be fair, of course I would." (Tr. 73). Mr. Santa stated that he would not convict on insufficient evidence because defendant was an Arab; he would judge the case based on the evidence. (Tr. 78). No more than that can be asked of any juror. The issue is not whether a prospective juror is free of prejudice, since very few if any of us are, but "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citations omitted). Both Ms. Zomback and Mr. Santa assured the court that their predispositions or inclinations would not prevent them from fulfilling their sworn obligation to weigh and decide the case based on the evidence. Under such circumstances, defendants have no viable claim that their rights were violated because the court refused to excuse Ms. Zomback and Mr. Santa for cause. *See United States v. Ploof,* 464 F.2d 116, 118 (2d Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 298 , 34 L.Ed.2d 224(1972) (no error in court's refusal to excuse for cause a juror who initially stated his thinking might be affected by an outside event, but after being pressed by the court said he would do his best to be fair). Even *United States v. Martinez–Salazar,* 146 F.3d 653 (9th Cir.1998), on which defendants rely and which will be discussed more fully below, is to the same effect. *Id.* at 656 ("We have upheld a district court's decision not to dismiss for cause a juror who initially admits bias as long as he or she ultimately asserts an ability to be fair and impartial.") (citations omitted). Accordingly, the motion for a new trial as it relates to the court's refusal to dismiss Ms. Zomback and Mr. Santa for cause is denied.

■ The refusal to excuse Grandpre for cause requires a fuller discussion since he did not assure the court that he would be

fair. The court did not believe he would vote for a verdict not based on the evidence; rather, the court believed that he was seeking to be excused from a potential three week jury trial which would cause him an inconvenience that he did not want to suffer.

Defendants rely on *Martinez–Salazar*, 146 F.3d 653, which stated that the United States Supreme Court's decision in *Ross v. Oklahoma*, 487 U.S. 81, 87, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), left open the question whether a 5th Amendment violation occurs when a defendant is required to use up all the peremptory challenges to which he is entitled because of the erroneous refusal of the court to excuse a juror for cause. The Ninth Circuit held that in such circumstances, the defendant's 5th Amendment due process rights have been violated.

■ That decision, however, is not the law of this circuit. In applying *Ross*, 487 U.S. at 88, 108 S.Ct. 2273 (loss of peremptory challenge not an infringement of constitutional right to impartial jury: "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."), this circuit has held that there can be no viable claim of the violation of a defendant's Fifth or Sixth Amendment rights because of loss of use of peremptory challenges unless the sitting jury ultimately chosen was itself biased. *See United States v. Rubin*, 37 F.3d 49, 54 (2d Cir. 1994); *United States v. Towne*, 870 F.2d 880, 885 (2d Cir.1989 ); *United States v. Brown*, 644 F.2d 101, 103–04 (2d Cir.1981).

Since defendants do not and cannot claim that the jury ultimately chosen was biased or infected with prejudice, the prerequisite in this circuit for their claim to succeed has not been met. *See Rubin*, 37 F.3d at 54 ("[Defendant] cannot prevail because he has not made the requisite showing that the jury eventually empaneled was not impartial. Under this court's precedents, without such a showing his

claim must fail.") (citations omitted); *United States v. Morales*, 185 F.3d 74 (2d Cir.1999). Accordingly, their claim that the court's refusal to dismiss Mr. Grandpre for cause entitles them to a new trial is dismissed.

**b. Weinberg's Sundry Claims of Prejudice in Re: Court's Conduct of Trial and Jury Charge**

■ Weinberg contends that he was denied his 6th Amendment right to present a defense by being prevented from questioning various witnesses as to their good faith beliefs. The defendant's good faith belief was relevant, and the jury was charged that the defendant's good faith belief was a complete defense. Testimony as to the good faith belief of the various government witnesses was irrelevant, a waste of time, and could have caused the jury to be needlessly confused. Nonetheless, the record shows that defendant's cross-examination was not curtailed to any appreciable degree and that some inquiries into a witnesses' beliefs were permitted, as is set forth in the government's brief at 28–30.

Weinberg also claims that after "nearly two-and-one half weeks of trial . . . over one thousand pages of material . . . including impeachment materials, investigative leads and other . . . favorable [evidence] . . . were provided just two days prior to closing argument," too late to allow their effective use by defendant. (Bondy Aff. at 8). This is an appreciable misstatement of the record. When the complaint about the late production of the material by the government and the prejudice to defendants was made on May 6, 1999, the court took the material home to examine it over the weekend to determine whether defendants had been prejudiced and to determine what relief should be afforded. (Tr. 1113–17). After examination, the court determined that none of the materials contained exculpatory or *Brady* material and that defendants had not been prejudiced. (Tr. 1396–97). Very little of the material was found to be pertinent and what was perti-

nent was allowed to be introduced. Subsequently, other documents were examined, which defendants claimed had exculpatory material (Tr. 1415), and again none such was found. (Tr. 1427). The court agreed to review any specific portions of a deposition which defendants designated as containing exculpatory material. (Tr. 1442–45). There was no follow-up on this matter. Misstatements and inaccuracies are allowable to a point but in this instance, the assertions are outrageously inaccurate. The court will rely on the record.

■ Weinberg also contends that a new trial is warranted based on the court's refusal to give the defendant's theory of defense charge. (Bondy Aff. at 15). Although the court did charge the jury on intent and good faith and more than adequately covered the substance of Weinberg's defense, it did not give the charge in the precise language proffered by defendant. The jury was told that good faith on the part of the defendant was a complete defense to a charge of securities fraud and that defendant did not have to establish his good faith as a defense. It was the government's burden to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt. The charge was sufficient and fully satisfied defendant's entitlements.

### c. Jury's Return of a Partial Verdict

The final claim is that the court "erred in forcing the jury to return a partial verdict." This again both misstates and distorts the record. The jury began its deliberations on May 13, 1999 at 1:14 p.m. (Tr.1901). The court called the jury to the courtroom at 5:25 p.m. (Tr.1910), preparing to dismiss them for the day. The foreperson, James J. Rosso was asked if the jury had been able to complete any of its deliberations (Tr.1910). He advised the court that the jury had completed part of its deliberations and asked, "Can we report one charge or is that permitted?" He was told that if the jury had completed any of its deliberations, it could be reported, but it had to be in writing. There followed this colloquy:

A Juror: We will do that.

The Foreperson: Fine

A Juror: You have to get it. We already voted.

The Foreperson: Can I just go out and bring it in to you?

The Court: But it has to be in writing. Your determination has to be in writing.

The Foreperson: Right. I'm saying does the rest of the jury have to leave now ?

The Court: No, I don't think so. If you have it in writing, you can bring it in (Tr.1911).

Mr. Russo left the courtroom and returned with the special verdict form on which had been recorded the jury's verdict finding the defendants guilty on count one. The verdict was read, and the jury was polled, dismissed for the day, and requested to return at 9 a.m. the next morning to continue its deliberations.

■ Weinberg contends that the court acted improperly in taking a partial verdict; that the court "surprised" the jurors by asking for their partial verdict; "ordered the foreman to return to the jury room to write out the oral verdict that he and the other jurors had arrived at together previously." (Bondy Aff. at 11). There is no support in the record for these inflated assertions.

Prior to calling the jury to the courtroom, the court advised counsel that it "was going to find out how they progressed, and if they haven't reached any conclusions, I am going to dismiss them for the night." (Tr.1909 ). The record is clear that the jury was not ordered to report anything. The foreperson said they had finished part of their deliberations and asked whether they could report one charge. He was told he could do so and that it had to be in writing. Mr. Russo then went to the jury room, retrieved the

**242**

special verdict form, and brought it into the courtroom.

In accepting the partial verdict, no error was committed. *See United States v. Levasseur,* 816 F.2d 37, 45 (2d Cir.1987) ("This court has long allowed partial jury verdicts which resolve less than all counts as well as those which resolve all counts against less than all defendants") (citations omitted). The considerations of concern in *United States v. DiLapi,* 651 F.2d 140, 146–47 (2d Cir.1981) were not present. The jury had reached a verdict as to both defendants on one count, and had recorded their decision on the special verdict form. It were ready to announce its partial verdict if permissible. They were advised that their verdict could be reported if they had concluded their deliberations and if their verdict was in writing. What occurred was consistent with Rule 31(b), F.R. Cr. P., and the law of the circuit. The court did not commit error in accepting the partial verdict. Therefore, Weinberg's claim in that regard provides no basis for a new trial.

The remaining claims raised by Weinberg are without merit and need not be discussed.

## CONCLUSION

In sum, the motion for a new trial on behalf of defendants Dolah and Weinberg because the court refused to dismiss jurors Zomback, Santa, and Grandpre is denied. The motion on behalf of Weinberg is denied in all other respects.

**IT IS SO ORDERED.**