09-0707-cr(L)
United States v. Cain, Jr., et al

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 11, 2011     Decided: January 31, 2012)

Docket Nos. 09-0707-cr(L), 09-2643-cr(CON), 10-0240(CON)

UNITED STATES OF AMERICA,

*Appellee,*

— v.—

DAVID CAIN, JR., CHRIS CAIN, JAMIE SOHA,

*Defendants- Appellants*,

PATRICK ACKROYD,

*Defendant.*[*]

B e f o r e:

NEWMAN and LYNCH, *Circuit Judges*, and RESTANI, *Judge.*[**]

---

[*] The Clerk of Court is respectfully instructed to amend the official caption in this case to conform to the listing of the parties above.

[**] The Honorable Jane A. Restani, United States Court of International Trade, sitting by designation.

Defendants appeal from judgments following a jury trial in the United States District Court for the Western District of New York (Richard Arcara, *Judge*) that resulted in their convictions for racketeering and various related offenses. They all contend, inter alia, that the district court erred in failing to instruct the jury on the relatedness and continuity factors required to establish a pattern of racketeering under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). Separately, David Cain, Jr. and Jamie Soha maintain that the evidence presented at trial was insufficient to support their convictions on three substantive counts of extortion. Each appellant also raises a number of issues that implicate only his own conviction. Most significantly, David Cain, Jr. argues that he was denied his constitutional right to counsel of his choice when his retained attorney was disqualified pre-trial on the basis of a conflict of interest.

Having reviewed these arguments, we conclude that the district court's RICO instruction was legally erroneous and that this error was prejudicial with regard to Chris Cain. With regard to the racketeering convictions of David Cain, Jr. and Jamie Soha, however, applying a plain error standard of review, we conclude that it is not reasonably likely that a properly instructed jury would have failed to find a pattern of racketeering. Accordingly, we reverse the RICO convictions with regard to Chris Cain only and remand for resentencing. We affirm the convictions in all other respects.

AFFIRMED in part and REVERSED AND REMANDED in part.

CHARLES F. WILLSON, Nevins & Nevins LLP, East Hartford, CT, *for Defendant-Appellant David Cain, Jr.*

MARC FERNICH, New York, New York, *for Defendant-Appellant Chris Cain.*

JONATHAN SVETKEY, Watters & Svetkey, LLP, New York, New York, *for Defendant-Appellant Jamie Soha.*

STEPHAN J. BACZYNSKI, Assistant United States Attorney, *for* WILLIAM J. HOCHUL, JR., United States Attorney for the Western District of New York, *for Appellee.*

GERARD E. LYNCH, *Circuit Judge*:

David Cain, Jr., Chris Cain, and Jamie Soha appeal from judgments entered on January 12, 2009, March 31, 2009, and December 18, 2009, respectively, following a jury trial in the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*) that resulted in their convictions for racketeering and various related offenses.

The defendants raise several challenges to their convictions. All three contend, inter alia, that the district court erred in failing to instruct the jury on the relatedness and continuity showings required to establish a pattern of racketeering under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

3

Separately, David Cain[1] and Jamie Soha maintain that the evidence presented at trial was insufficient to support their convictions on three substantive counts of extortion. Each appellant also raises a number of issues that implicate only his own conviction. Most significantly, David Cain argues that he was denied his constitutional right to counsel of his choice when his retained attorney was disqualified pre-trial on the basis of a conflict of interest.

Having reviewed these arguments, we conclude that the district court's RICO instruction was legally erroneous and that this error was prejudicial with regard to Chris Cain. With regard to the racketeering convictions of David Cain and Jamie Soha, however, applying a plain error standard of review, we conclude that it is not reasonably likely that a properly instructed jury would have failed to find that the proven predicates were sufficiently interrelated and continuous to constitute a pattern of racketeering. Accordingly, with regard to Chris Cain, we reverse the RICO convictions and remand for resentencing. For the benefit of the district court on remand, we also note several errors in the calculation of the sentencing guidelines applicable to Chris Cain. We affirm the convictions in all other respects.

## BACKGROUND

On October 3, 2007, a federal grand jury in the Western District of New York returned a 21-count indictment charging David Cain, his brother Chris Cain, and their

[1] All references in this opinion to "David Cain" or to "Cain" without further elaboration are to David Cain, Jr. Where David Cain, Sr. is intended, he will be specifically so identified. Chris Cain will be referenced by his full name.

4

cousin Jamie Soha with participating in and conspiring to participate in the conduct of the affairs of an association-in-fact enterprise through a pattern of racketeering activity, in violation of RICO, 18 U.S.C. §§ 1962(c) and (d), as well as with a variety of other substantive crimes allegedly connected to or arising out of that participation. The racketeering counts were predicated on twenty violations of state or federal law, including primarily various acts of extortion and arson, each of which was detailed in the indictment.

The case was tried to a jury over the course of six weeks in the fall of 2007. Proof at trial included the testimony of 60 witnesses, 241 exhibits and several stipulations among the parties. In support of the racketeering allegations, the government argued that during the period from 1994 to 2005 the defendants participated in a loosely-organized gang, headed by David Cain, whose purpose was the enrichment of its members and the avoidance of detection and prosecution by state and federal authorities. Much of the testimony was provided by cooperating witnesses who testified as to their involvement with various defendants in acts of extortion, marijuana trafficking, arson, robbery, insurance fraud and witness and evidence tampering.

On December 7, 2007, the jury returned guilty verdicts against all three defendants. Defendant David Cain was convicted of racketeering (18 U.S.C. § 1962(c)), racketeering conspiracy (18 U.S.C. § 1962(d)), mail fraud (18 U.S.C. § 1341), three counts of using fire to commit a felony (18 U.S.C. § 844(h)), three counts of extortion (18 U.S.C. § 1951), destruction of a civil aircraft (18 U.S.C. § 32(a)), destruction of a facility

5

used in interstate commerce (18 U.S.C. § 844(i)), three counts of witness tampering (18 U.S.C. §1512(b)(3)), concealment of evidence (18 U.S.C. § 1512(c)(1)) and conspiracy to commit the same (18 U.S.C. § 1512(k)).  The district court sentenced him to a cumulative 660 months in prison and ordered that he pay restitution in the amount of $599,330.45.  Defendant Chris Cain was convicted of racketeering, racketeering conspiracy, mail fraud, use of fire to commit a felony, and conspiracy to distribute marijuana (21 U.S.C. §§ 841, 846).  The district court sentenced him to 355 months in prison and ordered that he pay restitution in the amount of $24,000.  Defendant Jamie Soha was convicted of racketeering conspiracy, three counts of extortion, and one count of using of fire to commit a felony.  He was sentenced to 144 months in prison and was ordered to pay restitution in the amount of $314,123.72.[2]

## DISCUSSION

On appeal, the defendants challenge their convictions on numerous grounds. David Cain and Jamie Soha maintain that the evidence presented at trial was insufficient to sustain their convictions with regard to the three counts of extortion on which the jury

---

[2] These sentences were significantly influenced by statutory mandatory minimum sentences.  A violation of 18 U.S.C. § 844(h), criminalizing the use of fire or explosives for commission of another crime, incurs an additional 10-year term consecutive to any other sentence.  Each additional violation adds an additional 20-year consecutive term. Because David Cain was convicted on three counts under § 844(h), he faced a minimum of 50 years for these counts alone, to follow a mandatory minimum five-year sentence for a separate arson conviction under 18 U.S.C. § 844(i).  His sentence was thus the lowest sentence that the district court could have applied under the applicable statutes.  Chris Cain and Jamie Soha were each convicted of a single count under § 844(h), requiring at least ten years' imprisonment.

returned guilty verdicts against them.  All three appellants argue that the district court prejudicially erred in failing to instruct the jury on the relatedness and continuity requirement of RICO's pattern of racketeering element.  Each of the defendants also raises issues that pertain specifically to his own conviction.  We address the shared claims first, followed by those that are unique to each defendant's appeal.  For the benefit of the reader, we discuss the extensive factual record only where necessary to address the particular claims at issue.

I.  The David's Tree Service Extortion Counts

At the core of the government's case against David Cain were allegations that he supervised Jamie Soha and numerous other associates, many of whom testified at trial, in a criminal campaign aimed at cornering the tree service and logging market in northwest New York State.  Consistent with this theory, the indictment charged Cain and Soha with three counts of extortion in connection with their efforts to take over business from Keith Kent, Chuck Bracey and Dan Gollus, all of whom were competitors of Cain's company, David's Tree Service.  The jury returned guilty verdicts against both defendants on all three counts and the corresponding RICO predicates.  On appeal, Soha (joined by David Cain) argues that the proof at trial was inadequate to sustain the jury's guilty finding on the three extortion charges.

The Hobbs Act, the statute under which the defendants were convicted, defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official

7

right." 18 U.S.C. § 1951(b)(2). In asserting that the evidence at trial was insufficient for the jury to find that this definition was satisfied, the defendants rely heavily on Scheidler v. National Organization for Women, Inc., in which the Supreme Court suggested that property is "obtained" within the meaning of the Hobbs Act only if the defendants "received something of value . . . that they could exercise, transfer, or sell." 537 U.S. 393, 405 (2003) (internal quotation marks omitted). The defendants argue that because the government introduced no evidence that through their coercive conduct they obtained specific tree service jobs or a quantifiable portion of the tree-service market, it failed to carry its burden under Scheidler. This argument is unpersuasive for several reasons.

At the outset, Soha and Cain ignore the fact that the indictment charged attempted extortion as well as the substantive crime, and the jury was accordingly instructed as to the elements of attempt liability. The government therefore was not required to establish that David Cain or Jamie Soha in fact obtained any specific property belonging to the extortion victims but merely that they intended to do so and took a substantial step in furtherance of that goal. See United States v. Yousef, 327 F.3d 56, 134 (2d Cir. 2003). Construing the evidence in the light most favorable to the government, see United States v. Zhou, 428 F.3d 361, 369-70 (2d Cir. 2005), we see ample basis on which the jury could conclude that David Cain, aided and abetted by Jamie Soha, attempted to extort specific tree service and logging work from Kent, Bracey and Gollus.

For example, the evidence demonstrated that prior to the January 2001 vandalism incident upon which the first extortion count – involving Keith Kent – was based, David

8

Cain had established a pattern of making violent threats in order to deter Kent from competing for specific jobs. Kent testified that in 1999 he and Cain had considered collaborating in a logging job on the property of Tanya and Dan Hillman, but Cain ultimately cut him out of the negotiations. When Kent subsequently visited the Hillman property himself, he encountered Cain, who shouted at him in a "threatening tone," "What the hell are you doing on the property[?] . . . You better get the hell out of here. I'm going to get you. I'm not scared of you."

In May 2000 a similar incident occurred when Elizabeth Dietmann hired Kent for a logging job on her property, passing over David Cain, who had also submitted a bid. When Cain discovered that he had not been hired, he irately telephoned Dietmann demanding to know the reason for her decision and who would be doing the work instead. After learning that Kent had underbid him, Cain immediately hung up the phone. Dietmann called Kent to warn him, but the next day, Kent discovered that the tires of his equipment at the Dietmann jobsite had been slashed, a skidder had been tipped over and its instrument panel torn apart, and a bulldozer had been set on a collision course for his house before running out of gas. The same day, Kent's place of business was also vandalized: over forty tires were slashed, three or four engines were overturned and their fuel dumped out and at least two radiators were punctured. The evidence at trial, which included the testimony of many of the individuals who participated in the vandalism, established convincingly that David Cain had ordered the destruction because, as he told one witness, Kent had "ripped him off on some logs." The jury could properly infer that

9

the vandalism was intended as an implicit threat – "Give up the Dietmann job, or this will happen again." Certainly that is how Kent himself understood it. Describing the significance he attached to the vandalism, Kent stated at trial, "Well, I think someone was definitely threatening me."

The jury could easily have understood the January 4, 2001, vandalism incident that gave rise to the Kent extortion charge as consistent with this history. That day, Jamie Soha and David Cain drove several of their associates to Keith Kent's shop, where those individuals broke in and stole numerous pieces of logging equipment and a truck that was later set on fire. A few years later, Cain confronted Kent while the latter was engaged in a tree service job adjacent to Cain's property. In an apparent reference to the earlier vandalism incidents, Cain said, "You motherfucker, I thought I taught you a lesson. I'm going to put you in the fucking hospital. If you know what's good for you you're going to leave here now." Based on this comment and the entire course of Kent's dealings with Cain, the jury could have understood the January 2001 vandalism as an implied threat aimed at coercing Kent into relinquishing his book of business to Cain.

The jury was entitled to reach a similar conclusion with regard to the Bracey extortion count. In February 2002, David Cain hired Patrick Ackroyd and Jamie Soha to set fire to Chuck Bracey's tree service business. As Cain explained to Ackroyd, "Bracey was competition," and he "wanted to get him out of the line." Jeffrey Faso, who shared a cell with David Cain at the Niagara County Jail in 2004 or 2005, testified to a conversation in which David Cain told him that Bracey was "one of his competitors in a

10

tree business, and that he was underbidding him, and he started to underbid him more and more on certain jobs." Cain told Faso that he had confronted Bracey "on a few different occasions and said that, you know, he didn't appreciate him underbidding him. He was taking his work, and there was a time when he had mentioned . . . about some equipment he had damaged."[3] Based on this testimony and the evidence overall, the jury could infer that the February 2002 vandalism was intended to induce Bracey into relinquishing the jobs on which he had underbid Cain.

The most direct evidence that Cain attempted to extort specific assets from his victims came from Dan Gollus, the victim of the March 2003 vandalism that was the basis of the third extortion count. Gollus described the following incident, which occurred sometime in 2002:

> GOLLUS: He [David Cain] came to me and told me, "You know what I'm going to do?" he says, "I'm going to hit everybody and put them out of business, he says, "and then I can demand whatever price I want."
>
> THE GOVERNMENT: And you said?
>
> GOLLUS: Carefully, "Well, you're not going to put me out of business."
>
> [ . . . ]

---

[3] Faso's testimony goes on to discuss a plane of Bracey's that Cain claimed to have burned. Other evidence at trial, however, established that the plane in fact belonged to Dan Gollus, another competitor in the tree business. Though Faso may have conflated Bracey and Gollus at points, for the purposes of sufficiency review, we must assume that the above-quoted testimony regarding Cain's relationship with Bracey was accurate, as the jury was entitled to believe that testimony.

11

THE GOVERNMENT: Were you afraid of David Cain?

GOLLUS: Yes, I was.

THE GOVERNMENT: Tell us why?

GOLLUS: The things that I had seen and heard and experienced from him, I knew the man meant what he said. That wasn't the end of the conversation.

THE GOVERNMENT: Well, take us through the rest of the conversation.

GOLLUS: He told me, he says, "No, I'm not going to – I'm not going to put you out of business. I'm going to buy you out." And then he pointed his finger right at me and he said, "What do you want for your business?" And it wasn't for sale, but at that point it became for sale.

Gollus testified that he initially estimated the value of the business at $300,000 but that he ultimately quoted Cain a price of $125,000. Asked why, Gollus said, "After talking with [my girlfriend] and discussing all the facts, we decided it would be best if we could get out for that. We'd just get out. It was either that or perhaps lose it all." The following exchange then occurred:

THE GOVERNMENT: Lose it all why, sir, in your mind?

GOLLUS: I'd seen other places go up in flames.

COUNSEL FOR D. CAIN: Objection, Your Honor.

GOLLUS: Literally.

THE COURT: Overruled.

[ . . . ]

12

THE GOVERNMENT: What did that do to your state of mind?

GOLLUS: I was afraid that too might happen to me.

Based on the testimony above and the record as a whole, the jury had an ample evidentiary basis from which to conclude that David Cain, assisted by Jamie Soha and others, engaged in a sustained campaign to intimidate the competitors of David's Tree Service into handing over their businesses to him. As one of Cain's criminal associates describe Cain's approach to Gollus, it was "pretty much either buy him out or burn him out, one or the other."

Even putting aside the substantial evidence from which the jury could infer that Cain and Soha attempted to extort identifiable, tangible assets from Kent, Bracey and Gollus, the defendants' reliance on Scheidler is misplaced. The government's primary theory at trial was that David Cain threatened and employed force to induce his competitors to abandon their work "in order to enlarge his share of the tree service and logging markets." Contrary to the defendants' assertions, this theory of extortion is entirely consistent with the law as articulated by the Supreme Court and this Circuit. In United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), we held that the right to solicit accounts constituted property within the definition of the Hobbs Act, such that a defendant who owned a trash removal business could be convicted of a substantive violation of the Act for making threats that induced a competitor to stop soliciting business in the area. Although our decision in Tropiano predates Scheidler, it remains good law.

13

In <u>Scheidler</u>, a group of abortion clinics brought a civil RICO action against members of an antiabortion organization, alleging a nationwide conspiracy to shut down clinics through a pattern of racketeering activity that included acts of extortion in violation of the Hobbs Act. The plaintiffs' theory was that "because the right to control the use and disposition of an asset is property, [the protesters], who interfered with, and in some instances completely disrupted, the ability of the clinics to function, obtained or attempted to obtain [the clinics'] property." <u>Scheidler</u>, 537 U.S. at 401. The Supreme Court rejected this argument, reasoning that, while the protestors "may have deprived or sought to deprive [the clinics] of their alleged property right of exclusive control of their business assets," they did not acquire that right for their own use. <u>Id</u>. at 405.

It is true that, following <u>Scheidler</u>, in each Hobbs Act case we must now consider an issue that we did not address in <u>Tropiano</u> – whether the property that is the subject of the extortion is valuable in the hands of the defendant. Yet this will rarely be a problem in cases such as <u>Tropiano</u> or this one, in which the defendant seeks to exploit the very intangible right that he extracts from the victim. Indeed, <u>Scheidler</u> specifically cited <u>Tropiano</u> as a case whose holding was not implicated by the rule announced by the Supreme Court majority. <u>See Scheidler</u>, 537 U.S. at 402 n.6. Our decision in <u>United State v. Gotti</u> subsequently explicated the distinction between the two cases in greater detail:

> Had the <u>Tropiano</u> defendants sought merely to get Caron to
> stop soliciting collection accounts because they believed that
> the Milford area should be entirely free from any solicitation,
> <u>Tropiano</u> could not stand; like the anti-abortion protestors, the

14

> Tropiano defendants would have been seeking simply to deprive someone of a right without doing anything affirmative with that right themselves. But unlike the anti-abortion protestors, the Tropiano defendants *did* seek to take action with respect to Caron's solicitation rights; they sought to transfer those rights to themselves so that they could continue their own solicitation unimpeded by competition, and thus, in a sense, broaden their own solicitation rights.

459 F.3d 296, 324 (2d Cir. 2006).

That reasoning is equally applicable here. In contrast to the Scheidler protesters, who had no interest in controlling the clinics' abortion business apart from stopping the clinics themselves from performing abortions, David Cain's purpose in using violence against his victims was to acquire the market share held by Kent, Bracey and Gollus and to exploit it for his own enrichment. Indeed, the record is replete with statements by David Cain establishing that the purpose behind his campaign of vandalism was to induce his competitors to cede their rights to solicit business to him, "and thus, in a sense, broaden [Cain's] own solicitation rights." Id. As one criminal associate put it, "He basically wanted to put the other tree businesses out of service so he could be number one in Niagara County." Most blatantly, Cain used his reputation for violence and explicit threats to pressure Gollus to sell him his business for far less than Gollus believed it was worth. Those actions, as well as Cain's conduct towards Kent and Bracey, constitute extortion under the Hobbs Act.[4]

---

[4] To the extent our conclusion today is inconsistent with United States v. McFall, 558 F.3d 951 (9th Cir. 2009), we respectfully disagree with the Ninth Circuit's analysis in light of our own reading of Scheidler and our precedents in Tropiano and Gotti.

15

Finally with regard to these convictions, we reject David Cain's argument, made for the first time in his reply brief, that the consent element of extortion was not proven by sufficient evidence. The Hobbs Act speaks of extortion as "the obtaining of property from another, *with his consent*, induced by wrongful use of actual or threatened force." 18 U.S.C. § 1951(b)(2) (emphasis added). We have previously defined the element of consent as "the razor's edge that distinguishes extortion from robbery, which, in contrast, is defined in pertinent part as 'the unlawful taking or obtaining of personal property from the person or in the presence of another, *against his will*, by means of actual or threatened force.'" Zhou, 428 F.3d at 371, quoting 18 U.S.C. § 1951(b)(1) (emphasis in Zhou). We have also acknowledged, however, that "[a]t bottom, undeniably, the victim of an extortion acts from fear, whether of violence or exposure." Zhou, 428 F.3d at 371. The essential requirement to establish extortion is thus that the victim retained "some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be." Id.

Cain suggests that because Kent, Bracey and Gollus were incapable of operating their businesses during the period immediately following the vandalism incidents, his conduct cannot be described as obtaining the victims' property "with [their] consent." In other words, Cain contends that he was attempting to take his competitors' business from them by making it impossible, as a result of his force and violence, for them to compete, rather than by frightening them into abandoning the field to him. The argument overlooks the fact that the property interest that was the subject of the extortion counts

16

was not the defendants' right to operate during any specific period of time, but rather their right to perform certain work and to solicit business going forward. These rights were not directly infringed by the vandalism, as the victims remained free, once their equipment was repaired, to make good on their contracts and to seek out new ones. Although the cost associated with repairs and the threat of future violence might have been factors that weighed powerfully in the victims' decisions whether to cease their operations altogether or sell them to Cain, that is precisely the type of dilemma that the law of extortion embraces.

The evidence was more than sufficient for the jury to conclude beyond a reasonable doubt that Cain's purpose was to frighten his victims into ceding their rights to compete – indeed their very businesses – to him, and that, by engaging in a campaign of vicious arson and vandalism against them, he had taken substantial steps toward accomplishing that goal. Accordingly, the extortion convictions must be affirmed.[5]

## II. The RICO "Pattern" Instruction

Chris Cain, David Cain, and Jamie Soha collectively argue that the district court erred in failing to instruct the jury that, in order to establish a "pattern of racketeering" for

---

[5] Cain also argues that the extortion convictions were reached only after the indictment was constructively amended during trial. In support of this claim, he maintains that "the government was allowed to introduce evidence of threatened physical violence, when the indictment clearly stated 'fear of economic harm.'" Yet, for each of the extortion counts, the indictment alleged that Cain and his associates induced the victims' consent through "the wrongful use of actual and threatened force, violence and fear, including fear of economic harm." Cain's constructive amendment claim is therefore entirely without merit.

17

the purposes of securing a RICO conviction, the government was required to show that the predicate acts were related to one another and threatened continued criminal activity. We agree that the district court erred in failing to give the required relatedness and continuity instructions but conclude that the issue was forfeited due to the defendants' failure to object below. Although the error was not so prejudicial with regard to David Cain and Jamie Soha as to allow us to notice it under plain error review, we are of the view that the predicate acts proven with respect to Chris Cain are sufficiently disconnected to warrant reversal of his RICO convictions.

The substantive RICO provision under which the defendants were convicted makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d), in turn, makes it "unlawful for any person to conspire to violate" the substantive provisions of RICO. To satisfy the "pattern of racketeering activity" requirement, the statute requires "at least two acts of racketeering activity . . . the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Following Supreme Court precedent, however, we have held that the commission of two racketeering acts in furtherance of the RICO enterprise is not alone sufficient to establish a RICO pattern. See United States v. Indelicato, 865 F.2d 1370, 1376 (2d Cir. 1989) (en banc), citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 n.14 (1985). Rather, "a RICO pattern may not be

18

established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity." Indelicato, 865 F.2d at 1381. Our subsequent decisions have labeled the requirement that the predicate acts be related to one another "horizontal relatedness" and the requirement they have a nexus to the enterprise "vertical relatedness." See United States v. Burden, 600 F.3d 204, 216 (2d Cir. 2010).

The jury charge in this case failed to ensure that the horizontal relatedness and continuity requirements were met. The court instructed the jury that in order to satisfy RICO's pattern requirement, the government need only prove "that the defendant committed at least two of [the charged] racketeering acts within 10 years of each other." That was error, as our decision in Indelicato makes clear. Moreover, because a conspiracy charge under Section 1962(d) requires proof that "the conspirators reached a meeting of the minds as to the operation of the affairs of the enterprise *through a pattern of racketeering conduct*," United States v. Basciano, 599 F.3d 184, 199 (2d Cir. 2010) (emphasis added), the erroneous pattern instruction infected the jury's deliberations with regard to the conspiracy count as well.

The government suggests, however, that the error was harmless in light of the jury's finding that the predicate acts had a nexus to the charged enterprise (an issue on which the jury was properly instructed). It is true that, in the context of sufficiency-of-the-evidence review, we have held that "the requirements of horizontal relatedness can be established by linking each predicate act to the enterprise, although the same or similar proof may also establish vertical relatedness." United States v. Daidone, 471 F.3d 371,

19

375 (2d Cir. 2006). But that analysis presumes a properly instructed jury whose attention has been called to the distinct nature of the vertical and horizontal relatedness requirements. As the Supreme Court has noted in discussing the relationship between the pattern requirement and RICO's enterprise element, "while the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." United States v. Turkette, 452 U.S. 576, 583 (1981). Given the possibility that, if properly instructed, the jury in this case might have found that the proven predicates were not in fact interrelated, we cannot say that the district court's error was necessarily harmless. Indeed, in United States v. Long, faced with a case in which the district court had likewise failed to instruct the jury with regard to relatedness and continuity, we rejected precisely the argument that the government makes here, noting that "[t]he erroneous RICO pattern instruction prevented the jury from validly determining whether the requisite pattern existed." 917 F.2d 691, 698 (2d Cir. 1990).

The government next maintains, however, that even if the defective pattern instruction was not harmless, the defendants forfeited their right to challenge it on appeal by failing to object adequately during trial. We agree that the objection was not adequately preserved. Under Federal Rule of Criminal Procedure 30(d), "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate," and "[f]ailure to object in accordance with [the] rule

20

precludes appellate review," except where the plain error standard of Rule 52(b) is satisfied. Fed. R. Crim. P. 30(d).

The defendants did not include an instruction like the one they now contend was required in any request to charge submitted in the district court before or during trial. Nor did any defendant object during the charge conference that the district court's proposed charge omitted the relatedness and continuity language, or advise the court that such language should be included in the charge. Moreover, after the court gave the charge, but before the jury retired to deliberate, when given a last opportunity to raise objections to the charge, no defendant objected to the definition of "pattern" that the judge had utilized in instructing the jury.

In arguing that trial counsel adequately preserved a challenge to the defective pattern instruction, the defendants cite a colloquy between defense counsel and the trial court that took place after the charge had been delivered but before the jury had begun deliberations. Counsel for Jamie Soha objected to the court's instruction with regard to predicate act 9A of the indictment – the extortion of Chuck Bracey – which was also charged as a substantive count in the indictment. As relevant here, the court instructed the jury, "If you find that the defendant committed the Hobbs Act extortion charged in Count 5, then this 9th Racketeering Act is satisfied as to that defendant." Counsel for Jamie Soha, James Harrington, objected to this instruction on the ground that "even though it may have been proven beyond a reasonable doubt that a defendant committed this particular act, that doesn't necessarily make it a RICO act, because it still has to be

21

related to the RICO enterprise and it has to be related to the other."  The following

colloquy then took place:

> THE GOVERNMENT: Judge, I don't remember what you said or didn't say, but you instructed them on relatedness and those parts of RICO throughout the course of your instructions[6] and you had instructed them to read your instruction as a whole.  I think you've done what the law requires.

> THE COURT: Yeah. Your objection is noted, Mr. Harrington. Okay.

> COUNSEL FOR C. CAIN: Your Honor, on behalf of Chris Cain, I'd like to join in that same objection that Your Honor's just ruled upon, but so that the record notes it.  Our concern, obviously, being that jury might figure that a predicate must be checked if the substantive count is proven and then from there go on to conclude that it's part of a RICO pattern.

Counsel for David Cain later joined in the objection without elaborating on the point.

These statements by defense counsel failed to "direct the trial court's attention to

the contention that is to be raised on appeal," as is required to satisfy the Rule 30

standard.  See United States v. Civelli, 883 F.2d 191, 194 (2d Cir. 1989).  Plainly,

counsels' objections were specifically targeted at the district court's instruction that a

guilty finding with respect to count five would require the jury to conclude that the

corresponding RICO predicate had been proven.  Nothing in the colloquy suggests an

---

[6] The prosecutor was mistaken.  The judge in fact had not included such language in the charge.  Perhaps the prosecutor's error stemmed from his recollection of the government's proposed charge, which had included a complete pattern instruction. Rather than relying on recollection, a prosecutor would do well to listen carefully to a charge as delivered and promptly alert the trial judge to any omission.

22

objection to the district court's general instructions regarding the pattern element of a RICO offense. Certainly no one called the court's attention to the fact that it had omitted a key portion of the RICO charge. Indeed, defense counsel did not challenge the government's mistaken assertion that the court had properly instructed the jury on the relatedness requirement. Nor did the objection refer in any way to the continuity aspect of the pattern requirement. Accordingly, we conclude that the defendants failed to preserve the argument that they now raise on appeal.

Having concluded that the issue was not properly presented below, we next consider whether the district court's omission of a proper pattern instruction nevertheless constitutes plain error with regard to each of the defendants. As the Supreme Court has interpreted Rule 52(b), in order for us to correct an error that was forfeited in the district court, we must conclude that there was in fact error, that it was plain, and that it affected the defendant's substantial rights. See United States v. Pescatore, 637 F.3d 128, 141-42 (2d Cir. 2011), citing Johnson v. United States, 520 U.S. 461, 467 (1997). Where these three conditions have been met, we may exercise our discretion to notice a forfeited error, but only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Pescatore, 637 F.3d at 141 (internal quotation marks and brackets omitted).

On the facts of this case, we have little trouble concluding that the district court's omission of a pattern instruction satisfies the first two prongs of plain error review. As discussed above, "a RICO pattern may not be established without some showing that the

23

racketeering acts are interrelated and that there is continuity or a threat of continuity." Indelicato, 865 F.2d at 1381. Failure to instruct the jury on the relatedness and continuity requirements of a RICO offense was thus undoubtedly error. Moreover, this rule is well established in this Circuit, as is evidenced by our en banc decision in Indelicato and numerous cases that have followed it. See, e.g., Long, 917 F.2d at 696-98; United States v. Alkins, 925 F.2d 541, 553 (2d Cir. 1991); Ianniello v. United States, 10 F.3d 59, 62 (2d Cir. 1993). The substantial body of caselaw addressing this issue, as well as the fact that the government's proposed charge in this case included a proper pattern instruction, lead us to conclude that the district court's error in omitting a pattern instruction was "clear or obvious, rather than subject to reasonable dispute," and therefore "plain" within the meaning of Rule 52(b). See United States v. Kaiser, 609 F.3d 556, 565 (2d Cir. 2010), quoting United States v. Marcus, 130 S. Ct. 2159, 2164 (2010) (internal quotation marks omitted).

Whether the district court's error affected the defendants' substantial rights, however, is a closer question. As the Supreme Court has recently reminded us, "[i]n the ordinary case, to meet this standard an error must be prejudicial, which means that there must be a reasonable probability that the error affected the outcome of the trial." Marcus, 130 S. Ct. at 2164 (internal quotation marks omitted).

We can discern no such possibility with respect to the RICO convictions of David Cain and Jamie Soha. The core of the government's RICO case was the charge that David Cain, with the assistance of various associates including Jamie Soha, orchestrated a

24

campaign of extreme violence against rivals of his tree service and logging business in order to intimidate them into leaving the market. Consistent with this theory, predicate acts seven, nine, and ten of the indictment charged David Cain and Soha with the extortion of competitors Keith Kent, Charles Bracey, and Dan Gollus. As discussed above, the district court's extortion charge required the jury to find, inter alia, that the defendant "wrongfully obtained the property of another or attempted to do so . . . with the victim's consent, but that this consent was compelled by the wrongful use or threatened use of force, violence or fear." Having found that the extortion predicates were proved with respect to both David Cain and Jamie Soha, a properly instructed jury could not have failed to conclude that they were interrelated. Whether the property in question was specific tree-service jobs or simply the victims' share of the market, the evidence overwhelmingly demonstrated that the same objective motivated each act of extortion – to increase the market share of David's Tree Service and to enrich David Cain and his associates. In the words of one witness, "He wanted to be the biggest and best tree service in the area."

It is equally undeniable that the Kent, Bracey and Gollus extortions satisfy the continuity requirement. "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989) (internal quotation marks omitted). Both notions of continuity are satisfied here. The extortions occurred over more than two years, which we have held is a

25

sufficient period to support a finding of closed-ended continuity.  See DeFalco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001).  Moreover, we have recognized that where "the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity."  Burden, 600 F.3d at 219 (internal quotation marks omitted). Nothing in the evidence remotely suggested that the extortions of Kent, Bracey and Gollus were aimed uniquely at them.  Rather, the evidence overwhelmingly demonstrated that the purpose of the extortions was to secure David Cain's dominance over the tree service business in Niagara County – a goal that plainly posed a threat of future similar acts as needed to eliminate additional existing competitors or future entrants into the market.  Because it was the business of the Cain gang to advance its members' interests through the use of violent criminal means, the extortions exhibited open-ended continuity.

Having established that, if properly instructed, the jury in this case would necessarily have concluded that the relatedness and continuity requirements were proven with respect to predicate acts seven, nine and ten, we need not inquire further to conclude that the RICO convictions of both David Cain and Jamie Soha must be affirmed.  The last of these predicates – the extortion of Dan Gollus – occurred in March of 2003, and was therefore well within RICO's five-year statute of limitations when the defendants were indicted on these charges in May 2006.  See 18 U.S.C. § 3282 (1988); United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987).  The next most recent predicate – the extortion of Chuck Bracey – took place in February 2002 and thus satisfies RICO's ten-year

26

temporal relatedness requirement.  See 18 U.S.C. § 1961(5).  The extortion predicates

alone are thus sufficient to support David Cain's conviction under 18 U.S.C. § 1962(c)

and (d).  Furthermore, although the verdict form did not require the jury to make a finding

as to the particular racketeering predicates that were foreseeable to Soha as part of the

racketeering conspiracy charge, given that the jury found him guilty on the underlying

extortion counts, we have no doubt that, if the question had been posed, the jury would

have identified these three acts as part of the basis for its racketeering verdict.

Accordingly, because it is not reasonably probable that a properly instructed jury would

have returned a different verdict with regard to David Cain and Soha, we affirm their

racketeering convictions.[7]

---

[7] Cain maintains that the district court's failure to instruct the jury on relatedness and continuity also undermined the jury's finding that the criminal enterprise alleged in the indictment in fact existed.  Specifically, he asserts that absent a finding of horizontal relatedness between the first four predicate acts, which spanned from 1994 to 1996, and the remaining conduct, which took place between 2000 and 2005, the jury could not conclude that the racketeering enterprise existed for the entire 11-year period alleged in the indictment.  Cf. United States v. Morales, 185 F.3d 74, 81 (2d Cir. 1999) (finding the evidence insufficient to support the jury's finding of a single, ongoing criminal enterprise where the defendants were incarcerated for seven of the nine years covered by the indictment).  In so arguing, Cain commits the same error of reasoning that the government does in relying on Daidone for the proposition that the absence of a pattern instruction was harmless with respect to the racketeering convictions overall.  Just as the proof used to establish vertical relatedness may, but need not necessarily, establish horizontal relatedness, so too a failure to find horizontal relatedness is not inherently inconsistent with the finding that the enterprise charged in the indictment existed.  As the Supreme Court has recognized, the enterprise "is an entity separate and apart from the pattern of activity in which it engages," and "at all times remains a separate element which must be proved by the Government."  Turkette, 452 U.S. at 583.  The jury was properly charged regarding the definition of "enterprise," and found the evidence sufficient to conclude that the enterprise charged in the indictment existed.  Any error in the charge on the separate "pattern" element has no bearing on that finding.  To the extent David Cain challenges the sufficiency of the evidence of the criminal enterprise charged in the

We cannot conclude the same, however, with regard to Chris Cain. Unlike the other two defendants, Chris Cain was not charged in the three tree-service extortions that made up the core of the RICO case against his brother. Indeed, the evidence connecting Chris Cain's unlawful activities to the criminal association charged in the indictment was remarkably thin. The only predicate act that the jury found to have been proved with respect to both Chris Cain and David Cain (the alleged leader of the enterprise) was the November 1994 arson of a vehicle belonging to Niagara County Sheriff's Deputy Timothy Callaghan. But the government has acknowledged on appeal that the evidence was insufficient to support the jury's finding with respect to that predicate.

Because the court properly instructed the jury as to the nexus requirement and returned a guilty verdict against Chris Cain on the substantive RICO and conspiracy charges, we must assume that it found "some meaningful connection between the defendant's illegal acts and the affairs of the enterprise." As discussed above, we recognize that a jury may properly infer continuity and relatedness "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." See H.J., 492 U.S. at 242-43; see also Daidone, 471 F.3d at 375. But a jury would be equally entitled not to draw such an inference. In this case, the racketeering acts that the jury found to have been proved as to Chris Cain are not so clearly linked to each other or to the enterprise itself that we could confidently conclude that a rational jury, properly instructed, would necessarily or even likely find that they constitute a pattern of racketeering activity.

indictment, as the text above indicates we find there is sufficient evidence.

28

The government defends the jury's verdict with regard to only four predicate acts that involved Chris Cain: a conspiracy to grow and distribute marijuana in the summer of 2003, the September 2003 arson of Georgia Korosecz's residence at the instigation of her ex-boyfriend, arson and insurance fraud in connection with an August 2003 fire that destroyed a rental property owned by the Cains' parents, and a home invasion robbery of Marjorie Carter in the fall of 2003. As found by the jury, none of these offenses involved David Cain,[8] David's Tree Service or the large cast of characters who participated in the core extortion activities.[9] Nor is there any readily apparent connection among the crimes. Although two of the crimes involved arson, one involved insurance fraud related to the Cain family, while Chris Cain was hired to carry out the other by Randy Maedl, a stranger to the enterprise, whose only objective was to pressure Korosecz into cohabitating with him. The marijuana business was short-lived and had little in common with any of the other crimes attributed to the enterprise, and the robbery exhibited many indicia of an opportunistic act.

Given the minimal overlap in players and motives, the link between Chris Cain's criminal activities and the enterprise headed by David Cain was tenuous at best.

---

[8] Although David Cain was charged in the 2003 arson of the Cain family rental property, the jury acquitted him on that count.

[9] The only exception was Nathan Stanley, who, in addition to participating in several of the tree-service vandalism incidents, also testified to Chris Cain's marijuana growing activities and participated in the robbery of the Carter home that Chris Cain orchestrated. But Stanley's partner in the conduct involving Chris Cain was Paul Rutherford, Jr., who testified emphatically that he had not "had anything to do with David Cain since 1999," four years before the acts in question took place.

29

Certainly the relationship was not so strong that the jury would have been required to infer that the racketeering acts in which Chris Cain was named were interrelated to each other or to the other predicate acts associated with the enterprise and constituted (or threatened) continuing criminal activity. Aside from whatever minimal connection they might have to the overarching enterprise, the four proven predicates differ significantly with regard to the type of activity at issue and the defendant's putative motives; nothing suggests that a jury, properly focused on the requirement by a correct instruction, would have been likely to find beyond a reasonable doubt that they were interrelated.

Nor is it a foregone conclusion that they satisfy the continuity requirement. The Supreme Court has recognized that a threat of continuing criminal activity may be proven even when the number of predicate acts is small and they occur close together in time. See H.J., 492 U.S. at 242. But in this case, there is a "reasonable probability" that a jury considering the matter would conclude that the four predicate acts attributed to Chris Cain, which occurred over a period of just a few months, were neither temporally extensive enough nor sufficiently suggestive of future crime to support a finding of continuity. Chris Cain was therefore prejudiced by the district court's failure to instruct the jury as to RICO's pattern requirement.

Moreover, we conclude that the district court's incomplete instruction "seriously affects the fairness, integrity [and] public reputation of judicial proceedings" as they pertain to Chris Cain and that, accordingly, we are warranted in exercising our discretion to notice it. Pescatore, 637 F.3d at 141 (internal quotation marks and brackets omitted).

30

For the reasons that we have outlined, there is a reasonable likelihood that a properly instructed jury would conclude that the government has not proved beyond a reasonable doubt that Chris Cain's criminal conduct constitutes a pattern of racketeering activity. Thus, it may very well be that, absent the error, the jury would not have returned a guilty verdict on the substantive RICO count. Allowing this error to stand, in the face of a significant chance that the defendant was not guilty of the crime charged, would significantly affect the fairness and integrity of the proceeding.

Chris Cain's conviction for conspiring to violate RICO must be reversed as well. A conspiracy conviction under Section 1962(d) requires proof, inter alia, "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering." United States v. Basciano, 599 F.3d 184, 199 (2d Cir. 2010). Although a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts, he "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense." Salinas v. United States, 522 U.S. 52, 65 (1997). Thus we have recognized that, in deciding whether a defendant is guilty of RICO conspiracy, the jury must consider the predicate acts charged against the defendant and his alleged co-conspirators to determine "whether the charged predicate acts were, or were intended to be, committed as part of that conspiracy." Yanotti, 541 F.3d 112, 129 n.11 (2d Cir. 2008).

Because the verdict form in this case did not require the jury to identify the specific predicate acts that supported its verdict on the conspiracy charges, we cannot be

31

certain of the basis of the jury's verdict convicting Chris Cain of conspiracy. Based on the evidence, the jury could conceivably have found that Chris Cain conspired with David Cain and Jamie Soha to manage the affairs of their gang through a pattern of activity that included the predicate acts that the jury found proven with respect to David Cain and Soha. The defective pattern instruction would have little bearing on such a finding since, as we have already discussed, the evidence establishing the relatedness and continuity of the core extortion counts was overwhelming. But a jury may convict a defendant of conspiracy even when the defendant does not know the full extent of the conspiracy. United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994). Thus, the jury might also have convicted Chris Cain on the theory that he conspired with Paul Rutherford Jr. and others to manage the affairs of the Cain gang through a pattern of activity that included only the predicate acts with which he was himself charged – and, indeed, it is far more likely that the jury found that Chris Cain conspired to violate the RICO statute through his own acts than that he did so by agreeing to support activities of the enterprise in which he played no substantial part. For reasons that we have already articulated, the latter theory is compromised by the district court's failure to give a proper pattern instruction. Because of the risk that the jury convicted Chris Cain of RICO conspiracy on the basis of a legally flawed theory, we must reverse not only his substantive RICO conviction but his conviction on the conspiracy count as well.

32

III.  David Cain's Choice-of-Counsel Claim

In addition to the challenges to his RICO and extortion convictions discussed above, David Cain raises a number of appellate arguments that are not applicable to either of his codefendants.  Most significantly, he argues that he was denied his constitutional right to counsel of his choice when his retained attorney, Angelo Musitano, was disqualified by the magistrate judge overseeing pretrial proceedings.  The government argues that Cain forfeited this argument by failing to appeal the magistrate's order disqualifying Musitano, while Cain suggests that the forfeiture doctrine is inapplicable to a deprivation of the defendant's right to counsel of his choice, which the Supreme Court has defined as structural error.  See United States v. Gonzalez-Lopez, 548 U.S. 140, 148-50 (2006).  We need not resolve whether a structural error may be forfeited, a question that remains open in this Circuit and in the Supreme Court, see Puckett v. United States, 129 S. Ct. 1423, 1432 (2009), because we conclude that, in any case, the disqualification was not reversible error.

Cain's Sixth Amendment claim arises from an incident that occurred over a year before the case went to trial.  During a June 2006 status conference, the government informed Magistrate Judge Schroeder, who was overseeing pre-trial proceedings, that it intended to call Musitano as a grand jury witness in connection with potential witness tampering charges against Cain.  The government alleged that Cain had been involved in influencing Timothy Smider, a witness against Cain in a parallel state court prosecution, to provide perjured affidavits recanting statements that he had made that inculpated Cain.

33

Because Musitano, who also represented Cain in the state case, had introduced the affidavits in court, the government sought his testimony to establish that the affidavits had been in Cain's possession and that Cain had intended that they be filed in an official proceeding, an element of the offense.

At the time of the June 2006 conference, the government had not yet issued a subpoena to Musitano and represented that it would not be prepared to do so for several weeks. Nonetheless, Judge Schroeder expressed concern that if, at a later date, circumstances required that Musitano be replaced, the case would be significantly delayed. For his part, Musitano agreed that the issue of his eligibility to participate in the case "need[ed] to be resolved." Although it was suggested that Cain might prospectively waive any conflict that might arise pursuant to our procedure under United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), the judge expressed his belief that if Musitano were compelled to testify pursuant to the crime-fraud exception to the attorney-client privilege, it would create a per se, unwaivable conflict. The judge had good reason to believe that Musitano might be required to testify. Cain's prior lawyer, George Muscato, had been compelled to testify in a related case regarding his knowledge of an earlier recantation by Smider, after the district court concluded that the testimony was not protected by attorney-client privilege. Ultimately, Judge Schroeder elected to defer a decision on whether Musitano should be removed from the case until the government had served him with a subpoena. In the meantime, the judge appointed another attorney, Dan Henry, "for the limited purpose of meeting with Mr. David Cain and advising him," and forbade Musitano from speaking directly with Cain or Henry regarding the conflict issues.

34

When the parties returned for the next conference two weeks later, Musitano informed the court that he had received a subpoena to testify before the grand jury. Henry reported that he had spoken with Cain regarding the conflict and the potential for resolving it through some form of stipulation, but that he had ultimately concluded that a stipulation could not accomplish the desired goal, since the government had represented that it would seek to compel Musitano's testimony in any event. Henry also expressed the view that because Musitano's testimony would be used to establish an element of the offense, any conflict was unwaivable. After further discussion, Judge Schroeder agreed that, given the government's position that a stipulation would be inadequate to eliminate the need for Musitano to testify, the conflict was unwaivable. Although the judge acknowledged that the witness tampering charges might ultimately be brought as part of a separate indictment, he concluded that Musitano's ability to represent his client effectively would be compromised if he were simultaneously serving as a witness against him, even in a separate proceeding. Accordingly, over Cain's objection, the judge disqualified Musitano and appointed Henry as permanent counsel in his place.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. Implicit in this guarantee is the principle that, in most cases, "a criminal defendant may be represented by any counsel who will agree to take his case." United States v. Cunningham, 672 F.2d 1064, 1070 (2d Cir. 1982). The right to counsel of one's choice "is not an absolute one," however. United States v. Ostrer, 597 F.2d 337, 341 (2d

35

Cir. 1979).  The Sixth Amendment also embraces a right to effective assistance of counsel, which includes the right to be represented by an attorney who is free from conflicts of interest.  See Wood v. Georgia, 450 U.S. 261, 271 (1981).  Where the right to counsel of one's choice conflicts with the right to an attorney of undivided loyalty, the determination of which right is to take precedence must generally be left to the defendant, who may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation.  See United States v. Curcio, 694 F.2d 14, 24-25 (2d Cir. 1982).  Nonetheless, there exists a narrow class of so-called per se conflicts that are not susceptible to waiver.  Such conflicts may not be waived because, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  Wheat v. United States, 486 U.S. 153, 159 (1988).

Our decision in United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994) sets out the analysis that a district court confronted with "the specter of conflicts of interest" must follow in order to determine whether the right of the defendant to counsel of his choosing should be honored in a particular case.  At the initial, "inquiry" stage, the court must "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."  Id.  In satisfying its inquiry obligation, the district court may rely on the

36

representations of counsel as to his interest in the case and how any potential conflict might be cured.  Id. at 154.  If the court is satisfied at the inquiry stage that there is no actual conflict or potential for one to develop, its duty ceases.  Id.  Where the court determines that an actual or potential conflict exists but that it would not fundamentally impair the lawyer's representation, the district court should address the defendant directly and determine whether he wishes to make a knowing and intentional waiver of his right to conflict-free counsel in conformity with the procedures set out in Curcio, 680 F.2d at 888-90.  Finally, if the initial inquiry establishes that the conflict is "such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation," the district court must immediately disqualify him.  Levy, 25 F.3d at 153.  No waiver of the conflict is possible and, therefore, no Curcio hearing is required.

Although we have emphasized that the class of cases in which an attorney conflict is truly unwaivable is a "very narrow" one, United States v. Perez, 325 F.3d 115, 126 (2d Cir. 2003), we have also recognized that "district courts have broad latitude in making a decision whether to disqualify a defendant's chosen counsel," United States v. Fulton, 5 F.3d 605, 614 (2d Cir. 1993).  This is particularly true in the wake of the Supreme Court's decision in Wheat.  In that case, the Court considered whether the district court had properly rejected a substitution of defense counsel on the ground that the substitute attorney had an unwaivable conflict owing to his representation of two codefendants and potential witnesses in the case.  Although all three defendants had agreed to waive their rights to conflict-free counsel, the district court concluded that the conflict was

37

unwaivable and denied the request for substitution. The Supreme Court ultimately approved that decision, rejecting the defendant's argument that the district court's refusal to allow the substitution violated the Sixth Amendment.

The Court observed that two important interests may impose limits on a defendant's right to waive attorney conflicts: (1) "the essential aim of the [Sixth] Amendment," which is "to guarantee an effective advocate for each criminal defendant," and (2) the "independent interest" of federal courts "in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." 486 U.S. at 159-60. These interests, as well as the potential for gamesmanship on the part of the defendant who waives a conflict only to later claim ineffective assistance, weigh heavily in favor of affording the district court "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. at 163. Given the difficulties of the decision, the uncertainties involved where the conflict has yet to fully materialize, and the need for the district court to rely on its "instinct and judgment based on experience in making the [disqualification] decision," the Court concluded that although judges "must recognize a presumption in favor of petitioner's counsel of choice," the evaluation of whether "the facts and circumstances" of a particular case evince a conflict so serious as to be unwaivable is a discretionary one that is best left "primarily to the informed judgment of the trial court."

38

Id. at 163-64.  Accordingly, on the facts before it, the Court held that, "[v]iewing the situation as it did before trial . . . the District Court's refusal to permit the substitution of counsel in this case was within its discretion and did not violate petitioner's Sixth Amendment rights."  Id. at 164.

Consistent with the deferential approach dictated by Wheat, we have identified only two post-Wheat cases in which we reversed a trial court's decision with respect to disqualification.  Moreover, given the Court's admonition that "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant," it is unsurprising that both of those cases arose in the context of a defendant's post-conviction challenge to the district court's *refusal* to disqualify the convicted attorney.  United States v. Fulton, 5 F.3d 605, 612 (2d Cir. 1993), citing Wheat, 486 U.S. at 160 (alterations omitted); see also United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002).  It thus appears that, although we have considered challenges to the disqualification of counsel on the basis of a per se conflict in at least four cases since Wheat, we have never concluded that the trial court abused its discretion in disqualifying a conflicted attorney.[10]  See, e.g., United States v. Arrington, 867 F.2d 122 (2d Cir. 1989); Tineo v. Kelly, 870 F.2d 854 (2d

---

[10] Contrary to counsel's suggestion at oral argument, United States v. Perez, 325 F.3d 115 (2d Cir. 2003), is not such a case.  In Perez, a defendant who had waived his right to conflict-free representation and gone to trial subsequently appealed his conviction on the ground that the conflict was unwaivable.  We held that the district court acted within its discretion in allowing the waiver.  Id. at 128.  Although we have found two *pre*-Wheat cases in which we overturned the district court's disqualification order, In re Taylor, 567 F.2d 1183 (2d Cir. 1977), and United States v. Cunningham, 672 F.2d 1064 (2d Cir. 1982), the authority of those cases is questionable in light of the intervening Supreme Court decision.  See Tineo v. Kelly, 870 F.2d 854, 857 (2d Cir. 1989) (observing that it is not "clear that . . . Cunningham retains any force in light of the subsequent holding in Wheat").

39

Cir. 1989); United States v. Locascio, 6 F.3d 924 (2d Cir. 1993); United States v. Jones, 381 F.3d 114 (2d Cir. 2004).

Our decision in Jones is particularly instructive here. In that case, the district court found that the defendant's attorney suffered from an unwaivable conflict where there was a possibility that the lawyer himself would become a target of the grand jury investigation that had produced the indictment of his client, and at a minimum would be called to testify against the defendant. 381 F.3d at 117-18. Although the defendant argued on appeal that the conflict could have been resolved by stipulation, we concluded that a stipulation broad enough to cure the potential conflict would have not been forthcoming, since it would have required the defendants essentially to admit guilt. Id. at 121. On this basis, we concluded that the district court did not abuse its discretion in disqualifying the defendant's attorney:

> The risk that he would become a witness at trial was enough alone to allow the district court to reach this determination under an abuse of discretion standard. We could not expect the district court to rule otherwise where it seems more likely than not that a number of conflicts will materialize. Whether or not they materialize, defendant []would have a strong argument on appeal that he had been denied effective assistance of counsel.

381 F.3d at 121.

That reasoning is equally applicable here. Although Musitano was not a potential target of the grand jury investigation and his testimony may well have been less central to the prosecution than the testimony that would have been offered by the lawyer in Jones,

40

we cannot say that the district court abused its discretion in concluding that the risk that Musitano would become a witness against his client was sufficient to justify his disqualification.[11] The fact that Judge Arcara ultimately concluded that it was unnecessary to compel Musitano to testify does not undercut this analysis. "Viewing the situation as it did before trial," particularly in light of the prior experience of Muscato's compelled testimony and the parties' agreement that a stipulation would be ineffective, we cannot say that the district court exceeded "the broad latitude which must be accorded it in making this decision." Wheat, 486 U.S. at 163-64.

IV. David Cain's Remaining Claims

In addition to the claims above, Cain argues that the delay in bringing his case to trial resulted in a violation of his constitutional right to a speedy trial. Cain originally raised this argument before Magistrate Judge Schroeder in the form of a motion to dismiss the indictment filed three months before trial was set to begin. Judge Schroeder recommended denial of the motion in a thorough, 32-page Report and Recommendation that was subsequently adopted by the district court. We see no basis for concluding that the district court abused its discretion in declining to dismiss the indictment.

The Supreme Court's decision in Barker v. Wingo, 407 U.S. 514 (1972) sets forth the four factors that must be considered in analyzing whether a defendant's constitutional

---

[11] Because we conclude that the Magistrate Judge Schroeder appropriately exercised his discretion in concluding that Musitano's potential conflict was per se unwaivable, it follows that, contrary to Cain's assertion on appeal, the court was not required to conduct a Curcio hearing. See Levy, 25 F.3d at 153.

right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to the trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly. See id. at 530; see also United States v. Jones, 129 F.3d 718, 724 (2d Cir. 1997). These factors "must be considered together with such other circumstances as may be relevant," and "have no talismanic qualities." Barker, 407 U.S. at 533. Rather, they require courts to "engage in a difficult and sensitive balancing process." Id. We review the district court's balancing of these factors for abuse of discretion. United States v. Williams, 372 F.3d 96, 113 (2d Cir. 2004).

The first of the Barker factors, the length of the delay, is in effect a threshold question: "by definition, [a defendant] cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." Doggett v. United States, 505 U.S. 647, 652 (1992). In this case, the grand jury returned the original 4-count indictment charging David Cain, Jamie Soha and Patrick Ackroyd with violations of federal law on December 27, 2005. The government filed a superseding indictment adding Chris Cain as a codefendant and charging twenty-eight additional counts on May 5, 2006, and trial began on October 16, 2007. Although in Doggett the Supreme Court asserted in a footnote that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year," id. at 652 n.1, we note that the delay in this case of less than 22 months was "considerably shorter than that of other cases in

42

which no Sixth Amendment violation has been found." United States v. McGrath, 622 F.2d 36, 41 (2d Cir. 1980) (discussing a 24-month delay). The delay was particularly understandable given the presence of multiple defendants, the large number of allegations and the complexity of the racketeering case. Thus, while we assume that the delay was sufficient to trigger a speedy trial inquiry, the first Barker factor is largely neutral given the nature of the case.

With regard to the second factor, as Cain himself acknowledges, a significant factor contributing to the delay was the need to determine whether it would be necessary to disqualify his lawyer, Musitano, due to a conflict of interest. While Cain disparages the move to disqualify Musitano as a "deliberate delay tactic" that should be counted against the government in the speedy trial calculus, given that we have concluded that the disqualification was proper, it follows a fortiori that the resulting delay was justified. Other sources of pretrial delay included scheduling complications arising from parallel criminal proceedings against David Cain in state and federal court and extensive pretrial motion practice involving Cain and his codefendants, none of which could have been avoided. Thus, the delay in bringing the case to trial resulted primarily from the practical difficulties occasioned by the complexities of the case and not from congestion of the calendar or bad faith or neglect on the part of the government or the district court. Accordingly, the reasons for the delay do not favor a finding that Cain's constitutional rights were denied.

Moreover, although Cain has consistently asserted his right to a speedy trial, thereby satisfying the third Barker factor, he was not significantly prejudiced by the delay. "Although a showing of prejudice is not a prerequisite to finding a [S]ixth [A]mendment violation, courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice." Jones, 129 F.3d at 724 (internal quotation marks omitted). Cain's assertions of prejudice focus primarily on non-trial-related hardships that resulted from his pretrial detention, such as detriment to his business and family life. While "incarceration in the pretrial period [is] a hardship and must be included in the assessment of 'prejudice,'" United States v. Vasquez, 918 F.2d 329, 338 (2d Cir. 1990), we have generally required a showing of some significant trial-related disadvantage in order to establish a speedy-trial violation, see Flowers v. Warden, 853 F.2d 131, 133 (2d Cir. 1988) (collecting cases). Although Cain asserts that the delays also impaired his defense by creating "the risk of affected memories, witness [un]availability, and loss or destruction of potentially exculpatory evidence," he has not identified any lost witnesses or evidence and has made no serious effort to establish that these risks were significantly increased due to the relatively brief period in which his case was pending. Thus, based on our analysis of the Barker factors in light of the specific circumstances of this case, we find no basis to conclude that the district court abused its discretion in refusing to dismiss the indictment on speedy-trial grounds.

Cain's remaining arguments are likewise unavailing. He argues that the evidence was insufficient to support the jury's guilty findings with regard to counts eleven and

44

thirteen – which charged him with destruction of an aircraft and airplane hangar used in "interstate air commerce." See 18 U.S.C. §§ 32(a), 844(h)-(i). In his counseled brief, Cain argues that the evidence was insufficient to establish the jurisdictional element of the offenses given that the plane in question, which belonged to Dan Gollus, was used primarily for non-commercial purposes. Cain does not dispute, however, that Gollus used the plane on numerous occasions to travel out of state in order to inspect equipment for purchase in connection with his tree service business. Under 49 U.S.C. § 40102(a)(24)(A)(i), "interstate air commerce" is defined to include "the operation of aircraft in furthering a business or vocation between a place in . . . a State . . . and a place in another State." The jury was permitted to find that definition satisfied on the basis of Gollus's testimony. Likewise, because the hangar housed an instrumentality of interstate air commerce, the jury could fairly conclude that it constituted a building "used in . . . [an] activity affecting interstate or foreign commerce" within the meaning of 18 U.S.C. § 844(i).

The Supreme Court's decision in Jones v. United States, 529 U.S. 848 (2000), is not to the contrary. "The threshold inquiry under 18 U.S.C. § 844 is what is the function of the building that is the subject of the offense, and when that is ascertained, the court then decides whether such function is one affecting interstate commerce." United States v. Logan, 419 F.3d 172, 179 (2d Cir. 2005). In Jones, the Court addressed the threshold question and concluded that the statute's requirement that the building be "used" in an activity affecting commerce was "most sensibly read to mean active employment for

45

commercial purposes, and not merely a passive, passing, or past connection to commerce." 529 U.S. at 855. Accordingly, the Court concluded that the arson of a private residence that had no significant commercial function could not be prosecuted under the statute. Id. at 859.

The facts of this case are far removed from those of Jones. A private residence is hardly comparable to an airport hanger housing an airplane used to travel interstate for commercial purposes. Moreover, Jones does not require that the proof in support of the second prong of the inquiry under Section 844 – whether the structure's commercial function is one affecting interstate commerce – demonstrate anything more than a de minimis effect on interstate commerce. Indeed, the pervasive nature of congressional regulation of air travel suggests that the federalism concerns that animated the Court's decision in Jones are largely inapposite where Section 32(a) (which was not at issue in Jones) is concerned.

Also with regard to these convictions, Cain suggests in a supplemental pro se submission that our decision in United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003), limits the applicability of 18 U.S.C. § 32(a) to aircraft that are actually in flight at the time of their destruction. As the government correctly observes, this is a misreading of Yousef. Section 32(a) criminalizes the arson of "any aircraft in the special aircraft jurisdiction of the United States *or* any civil aircraft used, operated, or employed in interstate . . . air commerce" (emphasis added). In Yousef, we held that because the "special aircraft jurisdiction of the United States" is defined to include any "civil aircraft

46

of the United States" while that aircraft is in flight, Section 32(a) "covers any United States-flag aircraft while in flight, wherever in the world it may be." Yousef, 327 F.3d at 87. The "while in flight" requirement is not applicable to this case, however, because Cain was convicted under the "employed in interstate air commerce" prong of Section 32(a), rather than under the "special aircraft jurisdiction" prong.

Finally, Cain argues in his supplemental pro se brief that one of the lawyers who represented him at trial, Joel Daniels, suffered from an unwaivable conflict of interest and was responsible for various lapses in representation that deprived Cain of his constitutional right to effective assistance of counsel. In light of our "baseline aversion to resolving ineffectiveness claims on direct review," United States v. Salameh, 152 F.3d 88, 161 (2d Cir. 1998), and the Supreme Court's admonition that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance," Massaro v. United States, 538 U.S. 500, 504 (2003), we decline to review Cain's claim of ineffective assistance of counsel on the record now before us. Cain may pursue this claim in the context of a motion for relief from sentence under 28 U.S.C. § 2255. See United States v. Khedr, 343 F.3d 96, 100 (2d Cir. 2003).

V. Chris Cain's Remaining Claims

In addition to challenging his conviction on the RICO counts, Chris Cain makes a number of other arguments. First, he challenges the adequacy of the indictment with regard to one of the mail fraud charges. At trial, the government argued that Chris Cain violated the mail fraud statute by scheming to burn down a house owned by his parents so

47

that they could collect the insurance proceeds. Chris Cain maintains that the relevant count of the indictment "fail[ed] to allege a cognizable mail fraud, and [that] the government's efforts to remedy this defect at trial worked a constructive amendment." In support of this argument, Chris Cain cites United States v. Ingles, 445 F.3d 830 (5th Cir. 2006), in which the Fifth Circuit held that the mail fraud statute did not embrace a defendant's plot to burn down his son's house, where the son, who was the insured party, had no knowledge of the plot and the father merely hoped for or expected a share of the insurance proceeds. Id. at 836-38. We need not consider whether to adopt Ingles as the law of this Circuit, because, contrary to Chris Cain's assertions, the indictment did charge that Ann Cain and David Cain, Sr. were complicit in their son's fraud.

In assessing Chris Cain's constructive amendment claim, we must consider whether the indictment gave "notice of the core of criminality to be proven at trial," United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992) (internal citations and quotations omitted), and whether the proof that the government actually presented "modif[ied] essential elements of the offense charged," United States v. Clemente, 22 F.3d 477, 482 (2d Cir.1994). We have no trouble concluding that Chris Cain had sufficient notice that the government would attempt to prove that his parents knew of and participated in his insurance fraud scheme. The indictment alleged that "Ann Cain and David Cain, Sr. made a claim to the New York Central Mutual Insurance Company" in which they "*falsely* stated, in sum and substance, that the fire that destroyed the aforesaid residence was the result of an accident, and not the result of any intentional act"

48

(emphasis added). As Chris Cain's trial counsel acknowledged before the district court, "the parents' claim could be false only if one or both of them knew or had some connection with the fire by procuring it or doing it directly." It is therefore clear that the indictment gave Chris Cain adequate notice of the charge against which he would be required to defend.

Nor is it the case, as Chris Cain contends, that the district court's charge allowed the jury to convict him of mail fraud even if Ann Cain and David Cain, Sr. "had no knowledge of the scheme and therefore filed a legitimate insurance claim." The jury was instructed that in order to return a conviction, it was required to find that insurance fraud scheme was carried out using "false or fraudulent . . . representations" and that "a statement, representation or claim is false if untrue when made and was then known to be untrue by the person making it or causing it to be made." The jury was also told that "the government alleges that a false representation was made when . . . Ann Cain and David Cain, Sr. . . . stated that the fire that destroyed the property specified in the count at issue was not the result of design or procurement on the part of the insured or that the cause and origin of the fire was unknown to the insured." Regardless of who the jury understood to be the "person . . . causing [the insurance claim] to be made," in order to find that the claim was "false" under the court's instruction, the jury was required to conclude that the assertion that the insured parties – Ann Cain and David Cain, Sr. – did not procure the fire or know its origin was "untrue when made."

Second, Chris Cain raises a related objection to the district court's admission of certain testimony about the arson of his parents' rental property. At trial, the government offered testimony from Darwin Fifield, a tenant in the house just prior to its destruction. Fifield testified that, less than two weeks before the fire, he had an argument with Ann Cain during which she said that she would "rather burn the house than let [him] have it" and that it was "worth more to her burned to the ground than it was for [the Fifields] to be living in it." The defense objected to the statements as hearsay, but the district court admitted them "as statements of [Ann Cain's] then existing . . . intent" under the hearsay exception set out in Federal Rule of Evidence 803(3). Cain argues that the admission of the statements was erroneous in light of the fact that they were "devoid of any [reference to an] intention to act in the future." Moreover, as Chris Cain notes, we have construed Rule 803(3) to permit admission of a statement of intent against a non-declarant only when there is "independent evidence which connects the declarant's statement with the non-declarant's activities." United States v. Delvecchio, 816 F.2d 859, 863 (2d Cir. 1987).

Although Rule 803(3) is broader than Cain suggests, embracing not only statements of intent but statements of "the declarant's then existing state of mind, emotion, sensation, or physical condition" more generally, see Fed. R. Evid. 803(3), we need not decide whether these statements come within the rule or whether the requirements of Delvecchio were satisfied. To the extent that the statements were offered as relevant to Ann Cain's state of mind, they were not hearsay at all.

50

Under the Federal Rules of Evidence, to constitute hearsay, a statement must be an "assertion," Fed. R. Evid. 801(a)(1), that is "offered in evidence to prove the truth of the matter asserted," id. 801(c). The purpose of the rule is to exclude from the jury's consideration factual assertions made by declarants whose credibility is neither supported by an oath nor subject to testing by cross-examination. See 5 Weinstein's Federal Evidence § 802.02[3] ("The hearsay rule seeks to eliminate the danger that evidence will lack reliability because faults in the perception, memory, or narration of the declarant will not be exposed."). As Chris Cain's argument itself points out, Ann Cain's statements did not contain any direct assertion about her intention to burn down the house. Nothing in the government's proposed use of the statements rested on Ann Cain's truthfulness. Rather, any evidentiary weight the statements may have had with respect to the question of her intentions was *circumstantial*, and its probative value rested on the fact that they were made (as to which the jury could assess the credibility of the witness, Fifield, who testified, under oath and subject to cross-examination, that they were made). In other words, the statements had evidentiary weight not for their truth value as statements about what Ann Cain preferred or what the value of the house was, but rather because they expressed anger at Fifield, demonstrated consciousness on the part of Ann Cain of the possibility of burning the house, and indeed could be taken as implied threats to do just that. A jury that credited Fifield's testimony that the statements were made could infer from them that Ann Cain had some involvement in the actual arson of the house that occurred shortly thereafter, without making any assessment as to the credibility of Ann Cain as the proponent of any factual assertion whatsoever.

51

Thus, even if the district court erred in its Rule 803(3) analysis, that error was harmless because the statements were not used for an impermissible hearsay purpose and should have been admitted in any case. See United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998) (discussing the harmless error standard). Of course, under this analysis, the defendants might have sought an instruction directing that the jury not consider the statements to establish the truth of what they asserted – i.e. that Ann Cain actually preferred the destruction of the house and that it was in fact worth more burned to the ground than with Fifield in it. But that argument was equally available to Chris Cain under the district court's statement-of-intent theory, and he failed to raise it. Moreover, because the non-hearsay and hearsay uses are virtually the same, insofar as both constitute almost indistinguishable variations on the point that Ann Cain's words would give a reasonable juror a basis for inferring that she was implicated in the arson that shortly followed them, any error in failing to parse out the subtly different chains of reasoning that would lead to that conclusion was harmless: the true sting of the statements is not in the truth of any "assertion" that they make, but lies precisely in the fact that Ann Cain twice spoke of burning Fifield's residence, during an angry confrontation with him only days before his house was in fact deliberately burned by Ann Cain's own son.

Chris Cain also raises three objections to the district court's calculation of his sentencing guidelines range. Although we must remand for resentencing in any event in light of our reversal of the RICO convictions, we address his sentencing claims for the benefit of the district court on remand. We review the district court's interpretations of

52

the Sentencing Guidelines de novo and its related findings of fact for clear error. United States v. Guang, 511 F.3d 110, 122 (2d Cir. 2007). Chris Cain argues first that the evidence was legally insufficient to support his conviction on one of the RICO predicates – conspiracy to destroy a vehicle belonging to Timothy Callaghan, a deputy in the Niagara County Sheriff's Department. Although the jury found this predicate proven, the government now concedes that the evidence did not support the finding. In any event, the claim is moot in light of our decision to reverse Chris Cain's RICO convictions and vacate his sentence.

Cain's second sentencing argument is that the district court made insufficient factual findings to support the two-level enhancement for obstruction of justice that it adopted pursuant to U.S. Sentencing Guidelines § 3C1.1. The Probation Department found that Cain hid Mechelle Lawless from law enforcement for several weeks "in order to prevent her from assisting authorities investigating the October 2, 2003 robbery of the Carter residence," and the district court adopted this finding without objection. Chris Cain now argues, however, that the district court's application of the obstruction enhancement was inconsistent with its earlier conclusion that the government had presented insufficient evidence to sustain a witness tampering conviction with respect to the same incident. That argument is meritless. The theory of witness tampering charged in the indictment required the government to prove that Chris Cain "engag[ed] in misleading conduct toward" Mechelle Lawless "with intent to . . . evade legal process summoning [her] to appear as a witness." 18 U.S.C. § 1512(b)(2)(c). The district court

53

dismissed the count because, at the time of the alleged conduct, the particular grand jury whose summons was referenced in the indictment had not yet been impaneled. Unlike the witness tampering statute, however, U.S.S.G. § 3C1.1 is not limited to avoidance of formal legal process. The sentencing court could thus conclude that, in hiding Lawless, Cain attempted to "obstruct[] or impede[] . . . the administration of justice with respect to the investigation" of the Carter robbery without contradicting its Rule 29 ruling. U.S.S.G. § 3C1.1.

Finally, Chris Cain argues that the district court erred in considering a prior trespass conviction for the purposes of calculating his criminal history score under U.S.S.G. § 4A1.2. The Probation Department found that, among his other prior offenses, Chris Cain had been convicted in Somerset County, New York of Criminal Trespass in the Third Degree and sentenced to fifteen days time served. The Department recommended that the district court add one point to Chris Cain's criminal history computation because trespassing is listed in U.S.S.G. § 4A1.2(c)(1) as a petty offense that must be counted if "the prior offense was similar to an instant offense." Chris Cain objected to the additional point on the ground that trespassing is not "similar" to robbery or any of the other offenses for which he was convicted. At sentencing, the judge rejected this argument, stating:

> The defendant objects to one point that's being added under guideline 4A1.2(c)(1), which provides a sentencing for petty or misdemeanor offenses [is] counted only if the offense at issue is similar to [] one of the listed offenses. One of the listed offenses is trespassing. And in paragraph 102 the

54

probation officer correctly determined that the defendant's November, 1995 conviction for criminal trespass is assessed one criminal history point because trespassing is one of the listed offenses under 4A1.2(c).

The district court seems to have understood the guideline to condition whether a petty offense conviction is counted on whether the prior offense is similar to one of the enumerated offenses, of which trespassing is one. In fact the district court was required to find not only that the prior conviction was for one of the enumerated offenses "or offenses similar to them" but also that the prior conviction was "similar to an instant offense" – that is, to one of the offenses upon which the defendant is to be sentenced. On remand, it remains open to the district court to find that trespassing is sufficiently similar to one of the offenses of conviction that it may be included in Chris Cain's criminal history calculation. We express no view as to whether such a finding would be appropriate in this case. We merely note that, on the record before us, the district court does not seem to have made such a finding in the first instance.

VI. <u>Soha's Sufficiency-of-the-Evidence Claim Regarding the Kent Extortion Count</u>

Finally, Soha argues that the evidence was insufficient to show his participation in the vandalism of Keith Kent's property on January 4, 2001, and therefore to support his conviction on the corresponding extortion count. In making this claim, Soha bears a heavy burden. In reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict, we "must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor." <u>United States v. Gaskin</u>, 364

55

F.3d 438, 459 (2d Cir. 2004).  We also "resolve all inferences from the evidence and issues of credibility in favor of the verdict."  United States v. Howard, 214 F.3d 361, 363 (2d Cir. 2000).  "Reversal is warranted only if no rational factfinder could have found the crimes charged proved beyond a reasonable doubt." Gaskin, 364 F.3d at 459–60.  Moreover, "the jury's verdict may be based on circumstantial evidence," United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994).

In this case, there was abundant evidence to support the jury's finding that Soha aided and abetted the Kent extortion.  To convict a defendant of aiding and abetting a substantive crime, the government must prove that "the underlying crime was committed by someone other than the defendant and that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime." United States v. Pipola, 83 F.3d 556, 562 (2d Cir. 1996).  Although Soha appears not to have committed any acts of vandalism at the Kent site himself, both Roger Cooper and Patrick Ackroyd testified that he transported them to Kent's garage on January 4, 2001, as even he acknowledges.  Moreover, unlike defendant in United States v. Santos, 449 F.3d 93 (2d Cir. 2006), which Soha cites in his brief, the testimony throughout the trial showed that Soha was generally aware of David Cain's criminal activities and had participated in other incidents of vandalism.  The jury was entitled to rely on this evidence as well as the evidence of Soha's direct involvement in the Kent extortion in concluding that he possessed the requisite knowledge and intent as to the purpose of the visit to Kent's property.

56

**CONCLUSION**

We have considered the appellants' remaining claims and find them to be without merit. Accordingly, for the reasons discussed above, we reverse Chris Cain's RICO and RICO conspiracy convictions, affirm his convictions on all other counts, and remand for a new trial on the RICO charges, if the government chooses to pursue them, and/or for resentencing on the remaining counts. We affirm the convictions of both David Cain and Jamie Soha in their entirety.